(No. 2385—

MADISON CONSTRUCTION COMPANY, Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed March 25, 1938.*
*Rehearing granted May 11, 1938.*
*Opinion on rehearing filed September 13, 1939.*

TERRY, GUELTIG & POWELL, for claimant.

OTTO KERNER, Attorney General; MURRAY F. MILNE and GLENN A. TREVOR, Assistant Attorneys General, for respondent.

MR. JUSTICE LINSCOTT delivered the opinion of the court:

The complaint alleges that the State of Illinois, acting through its Department of Public Works and Buildings, duly gave notice to contractors and to this claimant that sealed proposals for the improvement of a State highway, known as State Bond Issue Route 150, Federal Aid Project Number 194, Section 1922, in Jackson-Randolph County, near Rockwood, Illinois, by constructing a paved roadway eighteen (18) feet wide with eleven (11) feet of earth shoulders, would be received by the Department on September 7, 1932, and as part of said notice to contractors stated that cement for said work would be furnished by the Department.

The claimant made a proposal which was accepted and the contract was awarded to the claimant, and the State and the claimant entered into a contract which was dated October 17, 1932. Under this contract the State was to furnish the cement necessary for the improvement and claimant was to furnish the labor and other materials.

Paragraph 3 of the claim is as follows:

"The claimant, thereupon and pursuant thereto made a proposal to the said Department for the construction of said road improvement, and the said proposal was, by the said Department, accepted and the work and contract awarded to the claimant, and thereafter the State of Illinois entered into the contract with the claimant which is in words and figures as follows:

CONTRACT.

"1. THIS AGREEMENT, made and concluded his 17th day of October, 1932, between the State of Illinois, acting by and through the Department of Public Works and Buildings, known as the party of the first part, and Madison Construction Company, his/their executors, administrators, successors or assigns, known as the party of the second part.

"2. WITNESSETH: That for and in consideration of the payments and agreements mentioned in the Proposal hereto attached, to be made and performed by the party of the first part, and according to the terms expressed in the Bond referring to these presents, the party of the second part agrees with said party of the first part at his/their own proper cost and expense

to do all the work, furnish all materials and all labor necessary to complete the work in accordance with the plans and specifications hereinafter described, and in full compliance with all of the terms of this agreement and the requirements of the Engineer under it.

"3. And it is also understood and agreed that the Notice to Contractors, Special Provisions, Proposal, and Contract Bond, hereto attached, and the Plans for State Bond Issue Route No. 150 Federal Aid Project No. 194, Section 122, in Jackson-Randolph County, dated August 17th, 1934, and the "Standard Specifications for Road and Bridge Construction," adopted by said Department January 2, 1932, are all essential documents of this contract and are a part hereof.

"4. In witness whereof, The said parties have executed these presents on the date above mentioned.

THE STATE OF ILLINOIS,
By the Department of Public Works and Buildings
By H. H. CLEAVELAND, *Director.*

ATTEST:
FRANK T. SHEETS,
*Acting Superintendent of Highways.*

Party of the First Part
(If a corporation)
Corporate
Name     MADISON ' CONSTRUCTION Co.
By ORLIE T. DUNLAP, *President.*

ATTEST:
M. D. POWELL, *Secretary.*
(Corporate Seal Attached)."

Party of the Second Part.

The complaint sets forth several provisions from the Standard Specifications for Road and Bridge Construction adopted by the Department on January 2, 1932.

It is averred that after entering into the contract, complainant immediately entered upon and commenced doing the work according to the contract and employed various persons as managers, superintendents, foremen, machine operators, watchmen, timekeepers and others in perfecting an organization to do the work efficiently and promptly, and placed its machinery and equipment necessary in service at the location of said work, and was prepared to promptly complete the work according to the contract without delay. Under the terms of the contract the work was to be completed July 1, 1933.

It is further averred that upon completion of all the preliminary work necessary to commence laying concrete, the claimant requested the Department to furnish the cement therefor in accordance with the contract, and on January 3, 1933, the Department authorized the claimant to obtain the

cement therefor from the Marquette Cement Manufacturing Company of Chicago, Illinois, and afterward on April 5, 1933, the Department authorized the claimant to obtain the cement from the Alpha Portland Cement Company, and the claimant being ready for the use of the cement, instructed the Alpha Portland Cement Company to ship six cars of cement on April 25, 1933, and thereafter, five hundred barrels of cement per day until further notice, said cement to be used upon this improvement.

It is further alleged that notwithstanding the authorization to obtain cement, that on or about April 25, 1933, the State withdrew its consent for the shipment of the cement and instructed the cement company to make no shipments until further notice, and by reason of the refusal of the Department to comply with its contract and furnish the cement as required, the claimant was compelled to suspend operations indefinitely and wait for cement, and the work was suspended from April 27, 1933, to June 27, 1933, at which time the Department furnished the cement and the work was continued until completed.

It is also charged that during the time the work was suspended, which was two months, the claimant paid its manager, its superintendent and other employees, and its machinery and equipment was held ready for use on the job and could have been used in said work on nearly every day during the period of time it was waiting for cement, and it had other contract jobs in which it could have used its machinery and equipment, and because of the failure of the State to furnish cement, the claimant avers that it is entitled to the sum of Twenty-one Thousand Two Hundred Twenty-one Dollars and Sixty-six Cents ($21,221.66).

From the evidence it appears that claimant did everything he could reasonably do to obtain cement.

It is a well known fact that during this time the cement dealers had greatly increased the cost of cement without any apparent reason. On April 27, 1933, claimant wrote the Highway Department to the effect that it had been put to huge expenses on account of unavoidable conditions, and for it to assume additional heavy expenses to cooperate on a bad situation, which could be avoided, it could not fully agree to do, unless the Department agreed to reimburse it for all of

its losses. The claimant stated in this letter that it had carefully studied all of the correspondence relative to the matter, and found only a "request" not to order cement had been made, and it positively stated that it had construed that to mean a "request" instead of positive instructions was given to avoid any liability, and claimant informed the State that if the State would assume the financial liability and expenses it would be glad to cooperate with the "request" and Governor Horner, but otherwise claimant was not willing to assume the expense of stopping the work and laying up the equipment. Claimant further called the State's attention to the fact that there were no provisions in the contract which permitted the State to cancel the contract or suspend the work at its option whenever the arrangements for securing cement by the State were not as satisfactory as the State had expected, and stated in its letter that the condition confronted was not brought about by the failure of the State to secure the cement, but simply, as claimant understood it, the State desired more favorable price or terms, and claimant stated that it was not responsible for this, and emphasized the fact that the State should be responsible for the loss and not the contractor. This is the substance of Claimant's Exhibit 10.

Claimant's Exhibit 13 is a letter from the Governor to the claimant. In this he acknowledged receipt of a telegram and stated while he was in sympathy with the claimant's situation, "you surely do not expect your State to submit to the efforts of a combination of cement manufacturers to impose an arbitrary and excessive price upon the State. Personally, I expect every good citizen to stand behind my efforts to prevent the State being mulcted."

From the above we see the attitude of both claimant and the State. It is very apparent that the claimant was delayed from April 27th to June 27, 1933. The contract provided for the work to be completed by July 1, 1933. Claimant finished paving on Section No. 122 on July 29, 1933, and clean up work and shouldering were completed October 14, 1933. It is not claimed that there was any increased cost in shouldering or cleaning caused by rise of price of labor or materials, or that claimant's paving equipment was held on the job for this work.

The Attorney General argues that there were nineteen days on which weather conditions would have prevented oper-

ation, even if the cement was available, and there does not seem to be anything in the record to controvert this.

The State offered testimony that claimant's method of arriving at its loss incurred by reason of idle equipment during the two months period included items which were not applicable to idle equipment for which claimant made charge. Claimant's testimony with reference to its expense for the equipment during the two months period was based upon the average cost of ownership as compiled by the Associated General Contractors of America, Inc., rather than upon claimant's actual experience in regard to the particular items of equipment involved.

The report of the Division of Highways disclosed that on January 20, 1934, the final estimate had been prepared by the engineer, and the claimant was paid the sum of $9,669.98, which was the last payment for this job; that the claimant accepted the warrant issued for this amount and cashed the same.

Several questions have been raised upon the record both by claimant and the State.

The State argues that under no circumstances would the claimant be entitled to compensation for the delay referred to for the period of time from July 1, 1933, to July 29, 1933, for the reason that claimant was to finish the job on July 1, 1933, and it eventually finished the paving job on July 29, 1933, and that nineteen days during the period in which the cement was not furnished were unsuitable for operation on account of weather conditions, and the State cites authorities to that effect.

The claimant argues that under its system of figuring damages, it was entitled to compensation, but under our view of the case it will not be necessary to decide which system was proper.

It is averred in claimant's complaint, Paragraph 3, Section 3 thereof, that Standard Specifications for Road and Bridge Construction, adopted by the Department on January 2, 1932, is an essential part of the contract, and made a part thereof. The Standard Specifications provide that the acceptance by the contractor of the last payment shall operate as and shall be a release to the Department from all claims or liability under the contract for anything done or furnished or relating to the work under the contract, or for any act or

neglect of the Department relating to or connected with the contract. Claimant does not dispute this, but says that at no time was this question raised until it was raised in the brief filed by the Attorney General, and that it was greatly surprised and, therefore, this Court should not consider it. That payment was finally made is not denied. This provision of the contract is set forth in the complaint. Just how they were taken by surprise does not appear. It was a part of the contract and certainly known to the claimant at the time the contract was entered into.

In the case of *Urech* vs. *State of Illinois,* 8 C. C. R., page 212, this Court held that "where party is paid amount provided in contract, and it is provided therein that acceptance of payment shall release State from any and all claims and liabilities thereunder, an allowance for an additional amount claimed as damages would constitute extra compensation and is prohibited by the Constitution of the State of Illinois."

The claimant cannot now be heard to say that it did not know that such a provision was in the contract. This was a contract that was voluntarily and fairly entered into by both parties.

At the time the claimant received the final payment, it must be held to have been familiar with this provision of the contract, and the constitutional provisions herein referred to, and for these reasons we hold that the claimant, if entitled to an award, has waived that right. An award, therefore, will be denied.

### OPINION ON REHEARING.

MR. JUSTICE LINSCOTT delivered the opinion of the court:

This cause now comes before the Court on an order allowing Petition for Rehearing.

It was charged in the Petition for Rehearing that the decision of the Court is against the claimant on the sole ground that the contract provides that acceptance by the contractor of the last payment shall operate as and for a release to the Department of Highways for all claims in connection with the work. The release was not pleaded and was not an issue at the trial.

After the Petition for Rehearing was granted, proof was introduced by O. T. Dunlap, president and manager of the

claimant, and many exhibits were offered in evidence. Several other witnesses testified, being C. M. Hathaway, Charles York and Clarence A. Hamlin, all tending to show that the provisions of the original contract concerning final payment had been waived on behalf of the highway officials of Illinois.

The original complaint alleges that the State of Illinois, acting through its Department of Public Works and Buildings, duly gave notice to contractors and to this claimant that sealed proposals for the improvement of a State Highway, known as State Bond Issue Route 150, Federal Aid Project Number 194, Section 1922, in Jackson-Randolph County, near Rockwood, Illinois, by constructing a paved roadway eighteen (18) feet wide with eleven (11) feet of earth shoulders, would be received by the Department on September 7, 1932, and as part of said notice to contractors stated that cement for said work would be furnished by the Department.

The claimant made a proposal which was accepted and the contract was awarded to the claimant, and the State and the claimant entered into a contract which was dated October 17, 1932. Under this contract the State was to furnish the cement necessary for the improvement and claimant was to furnish the labor and other materials.

Paragraph 3 of the claim is as follows:

"The claimant, thereupon and pursuant thereto made a proposal to the said Department for the construction of said road improvement, and the said proposal was, by the said Department, accepted and the work and contract awarded to the claimant, and thereafter the State of Illinois entered into the contract with the claimant which is in words and figures as follows:

CONTRACT.

"1. THIS AGREEMENT, made and concluded this 17th day of October, 1932 between the State of Illinois, acting by and through the Department of Public Works and Buildings, known as the party of the first part, and Madison Construction Company, his/their executors, administrators, successors or assigns, known as the party of the second part.

"2. WITNESSETH: That for and in consideration of the payments and agreements mentioned in the Proposal hereto attached, to be made and performed by the party of the first part, and according to the terms expressed in the Bond referring to these presents, the party of the second part agrees with said party of the first part at his/their own proper cost and expense to do all the work, furnish all materials and all labor necessary to complete the work in accordance with the plans and specifications hereinafter described, and in full compliance with all of the terms of this agreement and the requirements of the Engineer under it.

"3. And it is also understood and agreed that the Notice to Contractors, Special Provisions, Proposal, and Contract Bond, hereto attached, and the Plans for State Bond Issue Route No. 150 Federal Aid Project No. 194, Section 122, in Jackson-Randolph County, dated August 17th, 1934, and the "Standard Specifications for Road and Bridge Construction," adopted by said Department January 2, 1932, are all essential documents of this contract and are a part hereof.

"4. IN WITNESS WHEREOF, The said parties have executed these presents on the date above mentioned.

THE STATE OF ILLINOIS
By the Department of Public Works
  and Buildings
By H. H. CLEAVELAND, *Director.*

ATTEST:

    FRANK T. SHEETS,
*Acting Superintendent of Highways.*    Party of the First Part
                                (If a corporation)
                                Corporate
                                Name     MADISON CONSTRUCTION Co.

ATTEST:

    M. D. POWELL, *Secretary.*      By ORLIE T. DUNLAP, *President.*
    (Corporate Seal Attached)."    Party of the Second Part.

The complaint sets forth several provisions from the Standard Specifications for Road and Bridge Construction adopted by the Department on January 2, 1932.

It is averred that after entering into the contract, complainant immediately entered upon and commenced doing the work according to the contract and employed various persons as managers, superintendents, foremen, machine operators, watchmen, timekeepers and others in perfecting an organization to do the work efficiently and promptly, and placed its machinery and equipment necessary in service at the location of said work, and was prepared to promptly complete the work according to the contract without delay. Under the terms of the contract the work was to be completed July 1, 1933.

It is further averred that upon completion of all the preliminary work necessary to commence laying concrete the claimant requested the Department to furnish the cement therefor in accordance with the contract, and on January 3, 1933, the Department authorized the claimant to obtain the cement therefor from the Marquette Cement Manufacturing Company of Chicago, Illinois, and afterward on April 5, 1933, the Department authorized the claimant to obtain the cement from the Alpha Portland Cement Company, and the claimant being ready for the use of the cement, instructed the Alpha

Portland Cement Company to ship six cars of cement on April 25, 1933, and thereafter, five hundred barrels of cement per day until further notice, said cement to be used upon this improvement.

It is further alleged that notwithstanding the authorization to obtain cement, that on or about April 25, 1933, the State withdrew its consent for the shipment of the cement and instructed the cement company to make no shipments until further notice, and by reason of the refusal of the Department to comply with its contract and furnish the cement as required, the claimant was compelled to suspend operations indefinitely and wait for cement, and the work was suspended from April 27, 1933, to June 27, 1933, at which time the Department furnished the cement and the work was continued until completed.

It is also charged that during the time the work was suspended, which was two months, the claimant paid its manager, its superintendent and other employees, and its machinery and equipment was held ready for use on the job and could have been used in said work on nearly every day during the period of time it was waiting for cement, and it had other contract jobs in which it could have used its machinery and equipment, and because of the failure of the State to furnish cement, the claimant avers that it is entitled to the sum of Twenty-one Thousand Two Hundred Twenty-one Dollars and Sixty-six Cents ($21,221.66).

From the evidence it appears that claimant did everything he could reasonably do to obtain cement.

It is a well known fact that during this time the cement dealers had greatly increased the cost of cement without any apparent reason. On April 27, 1933, claimant wrote the Highway Department to the effect that it had been put to huge expenses on account of unavoidable conditions, and for it to assume additional heavy expenses to cooperate on a bad situation, which could be avoided, it could not fully agree to do, unless the Department agreed to reimburse it for all of its losses. The claimant stated in this letter that it had carefully studied all of the correspondence relative to the matter, and found only a ''request'' not to order cement had been made, and it positively stated that it construed that to mean a ''request'' instead of positive instructions was given to avoid any liability, and claimant informed the State that if

the State would assume the financial liability and expenses, it would be glad to cooperate with the "request" and Governor Horner, but otherwise claimant was not willing to assume the expense of stopping the work and laying up the equipment. Claimant further called the State's attention to the fact that there were no provisions in the contract which permitted the State to cancel the contract or suspend the work at its option whenever the arrangements for securing cement by the State, were not as satisfactory as the State had expected, and stated in its letter that the condition confronted was not brought about by the failure of the State to secure the cement, but simply, as claimant understood it, the State desired more favorable price or terms, and claimant stated that it was not responsible for this, and emphasized the fact that the State should be responsible for the loss and not the contractor. This is the substance of Claimant's Exhibit 10.

Claimant's Exhibit 13 is a letter from the Governor to the claimant. In this he acknowledged receipt of a telegram and stated that while he was in sympathy with the claimant's situation, "you surely do not expect your State to submit to the efforts of a combination of cement manufacturers to impose an arbitrary and excessive price upon the State. Personally, I expect every good citizen to stand behind my efforts to prevent the State being mulcted."

From the above we see the attitude of both claimant and the State. It is very apparent that the claimant was delayed from April 27th to June 27, 1933. The contract provided for the work to be completed by July 1, 1933. Claimant finished paving on Section No. 122 on July 29, 1933, and clean-up work and shouldering were completed October 14, 1933. It is not claimed that there was any increased cost in shouldering or cleaning up caused by rise of price of labor or materials or that claimant's paving equipment was held on the job for this work.

Since the original opinion was rendered in this cause this court, in passing upon similar facts in the case of *James P. O'Keefe Company, a Corporation,* vs. *State of Illinois,* No. 2438, said: "It also might well be assumed that the public officials of the State of Illinois, through its Chief Executive, the Governor of the State of Illinois, rightfully felt that the action of the cement manufacturers or dealers was such as to make those public improvements so costly as to be prohib-

itive and against public policy." In that same opinion we also quoted *Pope Mfg. Co.* vs. *Gormully,* 144 U. S. 224, 36 L. ed. 414, wherein it was held that courts have not exactly defined the term "public policy" because it is impossible to define with accuracy what is meant by that phrase, for an interference and violation of which a contract may be declared invalid. There the court said: "It may be understood in general that contracts which are detrimental to the interests of the public as understood at the time fall within the ban."

It appears from the record in this case that the State had entered into a contract with the claimant at a time when the price of cement was satisfactory to all concerned, and as we understand it, it is common practice to let contracts of this character at various seasons of the year, and at times when the contract is not to be performed for several months. The questions here presented are of much importance for those reasons. The exorbitant prices demanded by cement manufacturers affected the whole State of Illinois. This claim for damages arising from the fact that the State could not furnish cement, could, therefore, be denied on the grounds of public policy.

In the *O'Keefe* case, *supra,* we said: "It may be contended that in repudiating any liability on behalf of the State for its failure to furnish cement under the circumstances in this case is an unconscionable act. The answer to this is that in a situation of this kind the interest of the public, rather than the equitable standing of individual parties, is of determining importance; and we base our opinion upon principles of public policy and to conserve the public welfare."

It is admitted by claimant that there were times, owing to weather conditions, when the work could not have proceeded and no paving could have been laid, even if the State had furnished cement.

A much bigger and broader question, however, is presented than arises or could possibly arise under that provision of the contract wherein it is claimed that claimant has waived its right to further compensation, and that question is: Should the State be held to the same rules as any private party entering into a contract of this kind? That question has been determined by the Supreme Court of the United States and other Federal Courts.

In the case of *United States* vs. *Warran Transportation Company*, 7 Fed. (2d) 161, in discussing a similar feature, the Court said: "When the United States is a party litigant it assumes one of two characters; it may appear in the character of a sovereign or in the character of contractor." Continuing, the court held: "It follows, therefore, that when the United States appears as a contractor, it cannot be held liable for an obstruction to the performance of its contract resulting from its public and general acts as sovereign, whether legislative or executive." The court cited numerous authorities.

The Supreme Court of the United States in the case of *Horowitz* vs. *United States*, 267 U. S. 458, 69 L. Ed. 736, dismissed the petition, on demurrer, for failure to state a cause of action. On December 20, 1919, the claimant submitted a bid for certain silk, and at that time an agreement was made that the claimant would be given an opportunity to resell the silk before completing the payment of the purchase price, and that the "departments of the government having jurisdiction in matters of this kind" would ship the silk, which was then in Washington, within a day or two after shipping instructions were given. On December 22 claimant was notified by the board that the sale of the silk to him had been "approved," and claimant thereupon paid part of the purchase price, and on January 30, 1920, he sold the silk to a silk company in New York. On February 16 he paid the balance of the purchase price and wrote the board to ship the silk at once, by freight, to the silk company. Two days later claimant was notified by the board that it had received the shipping instructions and had ordered the silk to be shipped. Thereafter the price of silk declined greatly in New York market until March 4. On that date the claimant learned that the silk was still in Washington and had not been shipped because the government, through one of its agencies, the United States Railroad Administration, had, prior to March 1, 1920, placed an embargo on shipments of silk by freight, and that the shipment of silk for claimant had been held up. Afterwards the government shipped the silk to the consignee by express. It arrived in New York on or about March 12. The consignee then refused to accept delivery on account of the fall in the prices. And "by reason of the government's breach of the contract and agreement in placing an embargo, and failing

to ship the silk either by express or freight prior to March 4, 1920, the price of silk having declined, the claimant was forced to sell the said silk for $10,811.84 less than the price the consignee had agreed to pay for same had it been delivered in time.'' The petition alleges that the claimant is entitled to recover from the United States the said sum of $10,811.84 ''for and on account of the violation of the said agreement'' and prayed judgment. The court affirmed the Court of Claims and held that the United States, when sued as a contractor, cannot be held liable for an obstruction to the performance of a particular contract, resulting from its public and general acts as a sovereign. *Deming* vs. *United States,* 1 Ct. Claims, 190, 191; *Jones* vs. *United States,* 1 Ct. Claims, 383; *Wilson* vs. *United States,* 11 Ct. Claims, 513.

In the *Jones* case, 1 Ct. Claims, 383, the Court said: ''The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.''

By a parity of reasoning the same rules would apply to the State of Illinois acting in its sovereign capacity.

Basing our conclusions on the language of the Supreme Court of the United States in the *Horowitz* case, *supra,* we must hold that when the State of Illinois is sued as a contractor on a contract entered into by the Highway Department, it cannot be held liable for an obstruction to the performance of a particular contract, resulting from its public and general acts as a sovereign. The Governor of the State of Illinois was acting on behalf of the People of Illinois. No other person could have performed those acts. The Governor himself well stated his reasons in Claimant's Exhibit 13, which was a letter from the Governor to the claimant. In this

the Governor acknowledged receipt of a telegram and stated that while he was in sympathy with the claimant's situation, "you surely do not expect your State to submit to the efforts of a combination of cement manufacturers to impose an arbitrary and excessive price upon the State. Personally, I expect every good citizen to stand behind my efforts to prevent the State being mulcted."

The facts justified the acts of the Governor. It is unfortunate that this claimant lost money, but as said above, "in a situation of this kind the interest of the public, rather than the equitable standing of individual parties, is of determining importance."

Irrespective of whether the release relied upon by the Attorney General was or was not pleaded, under the conclusions above stated, we find that on the grounds of public policy, and under the holdings of the Supreme Court of the United States in the case of *Horowitz* vs. *United States*, 267 U. S. 458, 69 L. Ed. 736, the claim made by claimant cannot be allowed, and same is therefore denied and cause dismissed.