POPE MANUFACTURING COMPANY *v.* GORMULLY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 204.    Argued March 9, 10, 1892. — Decided April 4, 1892.

A court of equity will not enforce the specific performance of a contract wherein the defendant, in consideration of receiving a license to use certain patents belonging to the plaintiff during the life of such patents, agrees never to import, manufacture or sell any machines or devices covered by certain other patents, unless permitted in writing so to do, nor to dispute or contest the validity of such patents or plaintiff's title thereto, and further to aid and morally assist the plaintiff in maintaining public respect for and preventing infringements upon the same, and further agrees that if, after the termination of his license, he shall continue to make, sell or use any machine or part thereof containing such patented inventions, the plaintiff shall have the right to treat him as an infringer, and to sue out an injunction against him without notice.

THIS was an appeal from a decree dismissing a bill in equity, wherein the plaintiff sought an accounting upon a contract, and an injunction prohibiting the defendant from manufacturing and selling bicycles and tricycles containing certain patented devices, in violation of a contract entered into between the parties on December 1, 1884. A copy of this contract is printed in the margin.[1]

---

[1] This agreement made this first day of December, 1884, by and between the Pope Manufacturing Company, a corporation established under the laws of Connecticut and having a place of business in Boston, Massachusetts,

The bill alleged that the plaintiff was engaged in the manufacture and sale of bicycles and tricycles of superior quality,

---

party of the first part, and R. Philip Gormully, of Chicago, Illinois, party of the second part, witnesseth:

That whereas letters patent of the United States, numbered and dated as in the following list, were duly granted for the inventions therein set forth, and by certain good and valid assignments the same are now owned by the party of the first part:

(Here follows a descriptive list of sixty-five patents.)

And whereas said party of the second part is desirous of making, using and selling to others to be used bicycles embodying in their construction and modes of operation certain of the said inventions, and of securing license thereof under certain of said letters patent: Now, therefore, in consideration of one dollar by the party of the second part to the party of the first part, the receipt whereof is hereby acknowledged, and in further consideration of the covenants, agreements and stipulations hereinafter contained, said parties have consented and agreed as follows:

First. The party of the first part agrees to license, and does hereby license, the party of the second part, subject to the conditions and provisions herein named, to manufacture at the shop or factory of the party of the second part, in Chicago, in the State of Illinois, and in no other place or places, bicycles of fifty-two-inch size and upwards, of such quality, construction, grade and finish as to be sold in the market at retail prices not greater than eighty per cent of the retail list prices of the Standard Columbia bicycles of same or nearest similar sizes and styles, severally embodying the inventions set forth in those of the said letters patent numbered, (here follow the numbers of fifteen patents,) or either of them or either claim thereof and no others, so far as applicable within the conditions and restrictions herein contained, and to sell said bicycles to others to be used, and to use the same within and throughout the United States and the Territories thereof. This license is not to be understood or construed as a license to import, manufacture, buy, sell or deal in bicycles or tricycles, or in pedals, saddles, springs, rims, bearings or other patented parts thereof otherwise than as herein expressly stipulated. This license is not transferable, and is in addition to and not to modify or supersede previous ones except as herein expressed.

Second. The party of the second part hereby agrees to maintain a suitable place of business in said Chicago, and to keep there on hand a stock of bicycles as above referred to, and to promote and aid in extending the interest in bicycling and tricycling and the use of bicycles among those not already wheelmen, and to advertise the business by occupying and paying for one-page space continuously during the term of this license in the monthly magazine published by the Wheelman Company of Boston, Massachusetts, and to a reasonable extent to other publications of general circulation, and to advertise that it is licensed by the Pope Manufacturing Company.

that these machines embodied in their construction inventions covered by letters patent owned by the plaintiff; that in pur-

---

Third. The party of the second part agrees to keep at its place of business full, true and correct books of account, open at all reasonable times to the party of the first part and to its delegate, in which shall be set down all bicycles made or sold by the party of the second part, with the name or description, size, style and number thereof, and the names and addresses of the parties to whom sold.

Fourth. The party of the second part agrees to make full and true returns in writing to the party of the first part on or before the tenth day of each calendar month in each year, beginning with the 10th day of January, A.D. 1885, of all bicycles (and whether any or not) made, used or sold in the United States by the party of the second part during the preceding calendar month, with the size, style, number, name, or description, and make of the said machines and the names and addresses of the purchasers, and also of such machines held in stock by the party of the second part at the end of the said preceding month, said returns to be made under oath whenever required by the party of the first part, and to pay the royalties or license fees as herein stipulated on or before the said tenth day of each of said months, on all said bicycles used or sold by them or removed from their said factory or place of business in the preceding month.

Fifth. The party of the second part agrees to pay to the party of the first part the sum of ten dollars upon and for each and every bicycle in whole or in part made by or for it at any time prior to the 1st day of April, A.D. 1886, or the termination of this license, as part license fees or part royalties under said several letters patent or such or either claim thereof as may be used, and as part of the consideration for this agreement; and it is agreed that the party of the second part shall so pay to the party of the first part, under this license and agreement, at least the sum of one thousand dollars within and for each and any consecutive twelve calendar months during the continuance of this license.

Sixth. The party of the second part agrees to sell said bicycles at retail and not to sell the same or any of them to any person or party, either directly or indirectly, except upon such terms and at such prices as shall be satisfactory to the party of the first part and as shall first be submitted to and approved by the said party of the first part, such written submission of rates, terms and prices, with the said approval, to be taken as and to form a part of this agreement, and not to have or sell through any agent or agents in any other place than the said Chicago, nor pay or allow freight beyond the said Chicago, nor any bonus, rebate, allowance or commission on sales or from prices except as expressly agreed in writing between the parties hereto.

Seventh. The party of the second part agrees to mark or stamp in a legible manner the word " patented " on each machine made or sold under this license, together with the date or dates of the patents under which each

suance of a plan adopted by it, it reserved to itself the right to manufacture and sell the highest grades, and among others a

---

machine is made or sold, a list of such patents to be furnished by the party of the first part.

Eighth. The party of the second part hereby expressly admits the valid-, ity of the several letters patent hereinbefore mentioned, and of each and every claim thereof, and the title of the party of the first part thereto; and further admits specifically that the following inventions are embodied in the "Ideal" bicycle and the "Standard Columbia" bicycle and the "Expert Columbia" bicycle, as follows, to wit: (*a*) the invention claimed in the second clause of claim of said patent, R. 3297, in the saddles of said bicycle, and their connection therewith; (*b*) the invention claimed in the third clause of claim of the last-named patent in the cranks of said bicycles; (*c*) the invention claimed in the fourth clause of claim of said last-named patent in the backbones and rear forks of bicycles; (*d*) the invention claimed in third clause of claim of said patent No. 85,527 in the leg-guard of said bicycle; (*f*) the invention claimed in second clause of claim of said patent 86,834 in the brake mechanism of said bicycles and its connections; (*g*) the invention claimed in the third clause of claim of said patent 86,834 in the steering head of the said bicycles and its connections; (*h*) the invention claimed in the fifth clause of claim of said patent 87,713 in the tires of the wheels of said bicycles; (*i*) the inventions claimed in the third clause of claim of said patent No. 88,507 in the front forks of said Expert; (*j*) the inventions claimed in the fourth clause of claim of said last-named patent in the pedals of said bicycles; (*k*) the inventions claimed in the claim of letters patent No. 194,980 in the balance gear and its connections in the "Columbia" and "Victor" tricycles; (*l*) the invention claimed in the second clause of claim of said patent No. 197,289 as embodied in the ball bearings of said Expert bicycle and Victor tricycle and in "Æolus" ball pedals; and further admits that any machines or part of machines constructed in a substantially similar manner are or would be infringements of said claims respectively; and these admissions are unqualified and may at any time hereafter be pleaded or proved in estoppel of the party of the second part.

Ninth. The party of the second part agrees that it will not import, manufacture or sell, either directly or indirectly, any bicycle, tricycle or other velocipede, or the pedals, saddles, bearings, rims or other patented parts or devices containing any of the inventions or claims in either of the hereinbefore-recited letters patent, nor make, use or sell, directly or indirectly, either (*a*) backbones bifurcated for a rear wheel, or (*b*) balance gear allowing two wheels abreast, differing speeds on curves, or (*c*) bearings containing balls or rollers and laterally adjustable, or (*d*) brakes combined with the handle bars and front wheel, or (*e*) cranks adjustable to different lengths of throw, or (*f*) forks of tubular construction, or (*g*) mud-shield for steering wheels, constructed to turn within the wheel, or (*h*) pedals that are polygonal or offering two or more sides for the foot, or (*i*) round contrac-

style of bicycle known as the Standard Columbia bicycle; that under the agreement entered into with the defendant the lat-

tile rubber tires in grooved rims or rims containing or adapted for rubber or elastic tires, or (j) saddles adjustable fore and aft, or (k) saddles having a flexible seat and means of taking up the slack, or (l) steering heads, open or cylindrical, with stop for complete turning, or (m) leg-guards over front wheel, or (n) rims of wrought metal tubing and adapted to receive a tire, or (o) rims composed of sheet metal with overlapping edges, or (p) wheels containing hollow metallic rim and rubber tires, or (q) steering spindle and fork inclined to each other at an angle, or (r) two speed or power gears, or (s) "Tangent" spokes or "Warwick" rims, or (t) any other device or invention secured by either of these patents, other than according to the permission, conditions and description in paragraph numbered "first" in this agreement or as otherwise agreed in writing with the party of the first part, nor in any way, either directly or indirectly, dispute or contest the validity of the letters patent hereinbefore mentioned, or either of them or the title thereto of the party of the first part, but will aid and morally assist the party of the first part in maintaining public respect for and preventing infringements upon the same.

Tenth.   If and whenever the party of the first part shall reduce the royalties on bicycles of similar sizes, construction and grade, to any other licensee, the above-named royalties shall be reduced in like manner and proportion to the party of the second part, and the party of the first part will immediately notify the party of the second part of any such reduction of royalties.

The party of the second part may sell said herein-licensed bicycles to regular agents and dealers in the trade and doing business as such in any part of the United States at discounts from the said retail list prices not exceeding twenty-five per cent in any case, and to the smaller agents not exceeding fifteen per cent, it being understood and agreed that said discount of not exceeding twenty-five per cent may be allowed only to our (one?) dealer in each or either of the following cities: New York, N.Y.; Philadelphia, Pennsylvania; Boston, Massachusetts; Baltimore, Maryland; St. Louis, Missouri; San Francisco, California; St. Paul, Minnesota; and one city in the Southern States, and to two dealers in Chicago, Illinois.   Said party of the second part also agrees to keep the retail list prices fixed, and not to allow said licensed bicycles to be sold at retail at less than said retail prices, either by his own concern or by agents or dealers.

The party of the second part may sell the said licensed bicycles outside of the United States for actual use in foreign parts without the herein-contained restrictions as to prices and discounts, and upon satisfactory evidence of such export and foreign sale of said bicycles there shall be allowed a rebate or credit of one-half of said royalties thereon.

Eleventh.   If and whenever the party of the second part shall fail to make returns or to make payments as herein provided, or shall violate or

ter was granted the right to make, use and sell bicycles 52 inches in size and upwards, and of certain style and finish, and

---

fail to keep and perform the terms, conditions, promises or agreements or either of them herein mentioned on his part to be kept and performed, the party of the first part may withdraw and terminate this license and the agreements on its part mentioned to be kept and performed, by notifying the party of the second part in writing that the license herein contained has been revoked, and the party of the first part may in like manner revoke this license whenever the reported sales by the party of the second part for any consecutive twelve calendar months shall be less than one hundred machines. The party of the second part may surrender the license herein contained at any time by written notice to that effect and the returning of this contract to the party of the first part; but no such revocation or surrender, and no termination of this contract or any part of it, shall release or discharge the party of the second part from any payment, return, liability or performance which may have accrued, become due, or arisen hereunder, prior to or at the date of such revocation or surrender, or from the obligations, admissions and agreements contained in the sections hereof numbered " sixth," " seventh," " eighth," " ninth," and " eleventh " *hereof*, which are a part of the consideration for the granting of the license herein and are irrevocable, except by written consent of the party of the first part; and it is agreed that at the termination of the license herein contained at any time by expiration, revocation or surrender the party of the second part shall pay the within-named royalty on all said herein licensed machines or parts of machines whether wholly finished or not, or purchased or on hand, or ordered by or for said party of the second part at the date of said termination, and that the party of the second part will not sell the same except by first paying the full amount of said royalty and by complying with all the terms and conditions of this contract; and, further, that if the party of the second part shall continue after such termination of the license to make, sell or use any machine or substantial part thereof, containing either of the parts specifically referred to in section " ninth " hereof, or in any invention in any form set forth and claimed in the letters patent aforesaid, or any of them, the said party of the first part shall have the right to treat the party of the second part either as a party to and in breach of this contract or as a mere infringer, and the said party of the second part consents that in such case, upon any suit brought by the said party of the first part against the said party of the second part in any court, either upon this contract or for an infringement of the said letters patent, or any of them, an injunction may issue without notice to the said party of the second part restraining him from making, selling or using the said part or devices or the invention or inventions in said letters patent, or any of them set forth.

Witness our hands and seals the day and the year first above written.

THE POPE MANUFACTURING COMPANY.            THE POPE MFG. CO.,
,  R. PHILIP GORMULLY.                          by CHARLES E. PRATT, *Atty.*

embodying the inventions set forth in certain patents named; and that he should not manufacture bicycles embodying the features of certain other patents specified in the agreement. That said defendant expressly agreed that he would not manufacture or sell, directly or indirectly, bicycles, etc., containing any of the inventions or claims in either of said letters patent, nor make, use or sell, directly or indirectly, certain parts of bicycles specified in the contract, other than according to the conditions and terms in said license.

That it was provided by the eleventh clause of said contract that the defendant might surrender the license at any time by written notice, but it was provided in the same clause that no revocation, surrender or termination of said license, or any part of it, should release or discharge said Gormully from any liability which might have accrued, become due or arisen prior to, or at the date of, said surrender, or from the obligations, admissions and agreements contained in sections 6, 7, 8, 9 and 11; that such admissions and agreements were a part of the consideration for the granting of the license, and were irrevocable except by the written consent of the licensor; that it was provided in said clause 11 that if the licensee should continue, after the termination of said license, to make, sell or use any of the machines or parts thereof containing either of the parts referred to in section 9, plaintiff should have the right to treat the defendant as a party to, and in breach of, the contract; and that defendant, by said section 9, consented that if he did make, use or sell any machine containing such parts, an injunction might issue in favor of the plaintiff restraining him from so doing.

After setting forth an immaterial modification of such contract subsequently agreed upon, it further averred that the defendant entered upon the manufacture of bicycles under said license, made returns thereof, and paid royalties to plaintiff in accordance with the same, and that said license in respect to the clause claimed to have been violated is still in full force and effect. The bill further charged that since March 1, 1886, defendant had violated the ninth clause of the contract in constructing bicycles of a kind prohibited by the

contract, in violation of the first and ninth clauses of said contract.

For which reasons, the plaintiff prayed for an account of the machines made in violation of the agreement, and for an injunction.

The court below found that there was no contest between the parties as to the execution of the instrument set out in the bill; that the terms of the contract were such as to prohibit the defendant from making the high-grade styles and kinds of bicycles and tricycles complained of; that, if the contract was valid and in force, it was being violated by the defendant; but that the contract was not of such a nature as to entitle the plaintiff to any relief in a court of equity.    34 Fed. Rep. 877. From a decree dismissing the bill for the want of equity the plaintiff appealed to this court.

*Mr. L. L. Coburn* and *Mr. Edmund Wetmore* for appellant.

A court of equity has jurisdiction to enjoin parties from doing things which the defendant agreed for a valuable consideration not to do. *Eureka Co.* v. *Bailey Co.*, 11 Wall. 488; *Woodworth* v. *Weed*, 1 Blatchford, 165; *Wilson* v. *Sherman*, 1 Blatchford, 536; *McKay, Trustee* v. *Smith*, 29 Fed. Rep. 295; *Pope M'f'g Co.* v. *Owsley*, 27 Fed. Rep. 100.

When the defendant took a license and manufactured under said license, and the complainant owned a large number of patents, and in consideration of obtaining a limited and conditional license agreed that the other patents under which the complainant is manufacturing are valid, and that he would not embody in his machines the devices covered by those patents, the defendant is estopped from afterwards denying the validity of those patents, and a court of equity will enjoin him from making machines containing the devices covered by those patents. *Magic Ruffle Co.* v. *Elm City Co.*, 13 Blatchford, 151; *Eureka Co.* v. *Bailey Co.*, 11 Wall. 488; *Lockwood* v. *Hooper*, 25 Fed. Rep. 910; *Evory* v. *Candee*, 17 Blatchford, 200; *Burr* v. *Kimbark*, 28 Fed. Rep. 574; *Kinsman* v. *Parkhurst*, 18 How. 289.

*Mr. Charles K. Offield* and *Mr. W. C. Goudy* for appellee.

Mr. Justice Brown delivered the opinion of the court.

This case involves the question whether a court of equity can be called upon to decree the specific performance of a contract, wherein the defendant, in consideration of receiving a license to use certain patents belonging to the plaintiff during the life of such patents, agrees never to import, manufacture or sell any machines or devices covered by certain other patents, unless permitted in writing so to do, nor to dispute or contest the validity of such patents or plaintiff's title thereto, and further to aid and morally assist the plaintiff in maintaining public respect for and preventing infringements upon the same; and further agrees that if, after the termination of his license, he shall continue to make, sell or use any machine or part thereof containing such patented inventions the plaintiff shall have the right to treat him as an infringer, and to sue out an injunction against him without notice.

There are other covenants in this contract which show that the plaintiff intended to reserve to itself a large supervision and control of the defendant's business; for example, in the second clause, wherein the defendant agrees to maintain a place of business in Chicago, keep on hand a stock of bicycles, and advertise his business by occupying and paying for one page space continuously, during the term of his license, in a certain periodical published in Boston, and in other publications of general circulation; and to advertise that it is licensed by the plaintiff. By the sixth clause he agrees to sell bicycles at retail, and not to sell to any person except upon terms and prices satisfactory to the plaintiff, and as shall first be submitted to and approved by it; and shall not have or sell to any agent in any other place than Chicago, nor pay nor allow freight beyond Chicago, nor any bonus, rebate, allowance or commission on sales. By the seventh clause he agrees to stamp the word "patented" on each machine, together with the dates of the patents under which each of the machines is made or sold, according to a list furnished by the plaintiff.

It is rarely that this court is called upon to consider so unique a contract, and we have found some difficulty in assigning to it its proper place among legal obligations.   Its requirement is not merely that the licensee shall refrain during the term of his license from infringing other patents than those which he is expressly authorized to use, but shall forever afterwards, at least during the life of such patents, refrain from importing, making or selling articles covered by them, and from disputing the validity thereof or plaintiff's title thereto, and shall afford his moral aid and assistance in securing proper aid and respect for such patents.   The exact nature and amount of moral suasion the licensee is bound to exert in behalf of the plaintiff is not specified, but is apparently left to be determined by the circumstances of the case.

(1)  Ordinarily the law leaves to parties the right to make such contracts as they please, demanding, however, that they shall not require either party to do an illegal thing, and that they shall not be against public policy or in restraint of trade. It is argued with much earnestness here that this contract is open to the last objection, as an attempt to fetter the defendant from importing or making bicycles, in which he might otherwise have a perfect right to deal, and thus foreclose himself from the ability to earn an honest living in his chosen calling.   It is scarcely necessary to say that, without this contract, the defendant would have no right to manufacture or sell bicycles covered by valid patents of the plaintiff, so that the contract is not needed for the protection of the plaintiff to this extent.   The real question is whether the defendant can estop himself from disputing patents which may be wholly void, or to which the plaintiff may have no shadow of title.   It is impossible to define with accuracy what is meant by that public policy for an interference and violation of which a contract may be declared invalid.   It may be understood in general that contracts which are detrimental to the interests of the public as understood at the time fall within the ban.   The standard of such policy is not absolutely invariable or fixed, since contracts which at one stage of our civilization may seem to conflict with public interests, at a more advanced stage are

treated as legal and binding. In certain cases a man may doubtless agree that he will interpose no defence to a specified claim, and that another may take judgment against him without notice. This is a matter of every-day occurrence in connection with what are termed judgment notes. But if one should agree for a valuable consideration that he would set up no defence to any action which another might bring against him and such other person might enter up judgment against him in any such action without notice, we think that no court would hesitate to pronounce such an agreement invalid. There are certain fundamental rights which no man can barter away, such, for instance, as his right to life and personal freedom, and, in criminal cases, the right to be tried by a jury of his peers. Courts have even gone so far as to say that a man cannot consent to be tried by a jury of less than twelve men, whatever may be the circumstances under which the twelfth man is taken from the panel. Cooley's Cons. Lims. 319. We are reluctant to say that a right to defend a whole class of unjust claims may not be one of these. It is as important to the public that competition should not be repressed by worthless patents, as that the patentee of a really valuable invention should be protected in his monopoly ; and it is a serious question whether public policy permits a man to barter away beforehand his right to defend unjust actions or classes of actions, though, in an individual case, he may doubtless assent that a judgment be rendered against him, even without notice.

The reports are not entirely barren of authority upon this subject. Thus in *Crane* v. *French,* 38 Mississippi, 503, 530, 532, it was held that though a party may omit to take advantage of a right, such as the right to plead the statute of limitations, secured to him by law, he could not bind himself by contract not to avail himself of such right if it be secured to him on grounds of public policy. " But there appears to be," says the court, " a clear distinction between declining to take advantage of a privilege which the law allows to a party, and binding himself by contract that he will not avail himself of a right which the law has allowed to him on grounds of public

policy.  A man may decline to set up the defence of usury, or
the statute of limitations, or failure of consideration, to an
action on a promissory note.  But it would scarcely be con-
tended that a stipulation inserted in such a note, that he
would never set up such a defence, would debar him of the
defence if he thought fit to make it. . . .  Suppose, then,
an agreement made by the maker of a note that he would not
set up the defence of usury.  Would an action lie for a breach
of that agreement, in case the party should make the defence
in disregard of it?  It appears not, and the reason is, that the
right to make the defence is not only a private right to the
individual, but it is founded on public policy which is pro-
moted by his making the defence, and contravened by his
refusal to make it. . . .  With regard to all such matters
of public policy, it would seem that no man can bind himself
*by estoppel* not to assert a right which the law gives him on
reasons of public policy."  There are cases wherein it is held
that a promise not to plead the statute of limitations is a good
bar, but they are those wherein the promise was made after
the cause of action had accrued, and where it was considered
by the court as a new promise.  There are a few cases, how-
ever, which hold that an agreement not to plead the statute,
made upon the instrument, or at the time of its execution,
may be pleaded as an estoppel.  So in *Stoutenburg* v. *Lybrand*,
13 Ohio St. 228, it was held that a contract which provides
that a defendant in a proceeding for divorce shall make no
defence thereto, is against public policy, and therefore void.
"The tendency of such agreements," said the court, "is to
mislead the court in the administration of justice, and injuri-
ously affect public interests."  A like ruling was made in
*Sayles* v. *Sayles*, 1 Foster (21 N. H.) 312; and in *Viser* v. *Ber-
trand*, 14 Arkansas, 267.  So in *Bell* v. *Leggett*, 3 Selden (7
N. Y.) 176, 179, it was said that "all contracts or agreements
which have for the object anything which is repugnant to jus-
tice, or against the general policy of the common law, or con-
trary to the provisions of any statute, are void;" and that
this principle has often been applied by our courts to contracts
which had for their objects the perversions of the ordinary

operations of the government.    In that case a note given by a
third person to a creditor in consideration of his withdrawing
opposition to the discharge of a bankrupt debtor, was held to
be void as against the policy of the law.    In most of the States
wherein the question has arisen it has been held that a debtor
is not bound by his waiver of his homestead or other exemp-
tions upon execution.    *Kneettle* v. *Newcomb*, 22 N. Y. 249,
251.    " In these cases," said the court, " the law seeks to miti-
gate the consequences of man's thoughtlessness and improvi-
dence, and it does not, I think, allow its policy to be invaded
by any language which may be inserted in the contract."    The
exigencies of this case do not require us to decide the question
whether a man may or may not contract beforehand not to
set up a certain defence to a particular action; but we are of
the opinion that a contract not to set up any defence what-
ever to any suit that may be begun upon fifty different causes
of action is in violation of public policy.    See, as pertinent to
this question, *Insurance Co.* v. *Morse*, 20 Wall. 445; *Doyle* v.
*Continental Ins. Co.*, 94 U. S. 535: *Barron* v. *Burnside*, 121
U. S. 186.

(2) But whether this contract be absolutely void as contra-
vening public policy or not, we are clearly of the opinion that
it does not belong to that class of contracts, the specific per-
formance of which a court of equity can be called upon to
enforce.    To stay the arm of a court of equity from enforcing
a contract it is by no means necessary to prove that it is in-
valid; from time to time immemorial it has been the recog-
nized duty of such courts to exercise a discretion; to refuse
their aid in the enforcement of unconscionable, oppressive or
iniquitous contracts; and to turn the party claiming the
benefit of such contract over to a court of law.    This distinc-
tion was recognized by this court in *Cathcart* v. *Robinson*, 5
Pet. 264, 276, wherein Chief Justice Marshall says: " The dif-
ference between that degree of unfairness which will induce a
court of equity to interfere actively by setting aside a contract,
and that which will induce a court to withhold its aid, is well
settled.    10 Ves. 292; 2 Coxe's Cases in Chancery, 77.    It is
said that the plaintiff must come into court with clean hands,

and that a defendant may resist a bill for specific performance, by showing that under the circumstances the plaintiff is not entitled to the relief he asks.     Omission or mistake in the agreement, or that it is unconscientious or unreasonable, or that there has been concealment, misrepresentation or any unfairness, are enumerated among the causes which will induce the court to refuse its aid." This principle is reasserted in *Hennessy* v. *Woolworth*, 128 U. S. 438, 442, in which it was said that specific performance is not of absolute right, but one which rests entirely in judicial discretion, exercised, it is true, according to the settled principles of equity, and not arbitrarily or capriciously, and always with reference to the facts of the particular case. *Willard* v. *Tayloe*, 8 Wall. 557, 567 ; *Marble Co.* v. *Ripley*, 10 Wall. 339, 357 ; 1 Story's Eq. Jur. sec. 742; *Seymour* v. *Delancey*, 6 Johns. Ch. 222, 224 ; *White* v. *Damon*, 7 Ves. 30, 35 ; *Radcliffe* v. *Warrington*, 12 Ves. 326, 331.

These principles apply with great force to the contract under consideration in this case. Not only are the stipulations in paragraphs 9 and 11 unusual and oppressive, but there is much reason for saying that they were not understood by the defendant as importing any obligation on his part beyond the termination of his license.     Indeed, the operation of these covenants upon his legitimate business was such that it is hardly possible he could have understood their legal purport. The testimony upon this point was fully reviewed by the court below in its opinion, and the conclusion reached that the contract " was an artfully contrived snare to bind the defendant in a manner which he did not comprehend at the time he became a party to it."     We have not found it necessary to go into the details of this testimony.     While we are not satisfied that his assent to this contract was obtained by any fraud or misrepresentation, or that the defendant should not be bound by it to the extent to which it is valid at law, we are clearly of the opinion that it is of such a character that the plaintiff has no right to call upon a court of equity to give it the relief it has sought to obtain in this suit.     We express no opinion upon the question whether an action at law will lie upon the

covenants of the ninth clause of the contract not to manufacture or sell the devices therein specified.

The decree of the court below dismissing the bill is, therefore,

*Affirmed.*