Irvin HILTON, Respondent,

v.

Dale NELSEN, et al., Appellants, (48695)

Lyle Mandt, Appellant. (48694)

Nos. 48694, 48695.

Supreme Court of Minnesota.

June 15, 1979.

Rehearing Denied Aug. 13, 1979.

Carter & Carter and Robert C. Carter, Roseau, Robins, Davis & Lyons and Robert M. Wattson, Minneapolis, for Nelsen et al. 48695.

Kruta & Muldoon and Jaroslav Kruta, Red Lake Falls, for Mandt 48694.

Olin & Stroble and Robert D. Stroble, Thief River Falls, for respondent.

Heard before KELLY, WAHL, and STONE, JJ., and considered and decided by the court en banc.

BRUCE C. STONE, Justice.*

This is an appeal from the order of the district court awarding plaintiff specific performance of a contract for the sale of farmland and damages. We affirm in part, reverse in part, and remand for a new trial at law on the issue of damages.

In September 1974, defendants Dale and Geraldine Nelsen entered into negotiations

---

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.St. 2.724, subd. 2.

for the sale of their 720-acre farm to plaintiff, Irvin Hilton, a Missouri real estate investor who had come to defendants' real estate agency, Phelps Farm Sales, looking for farm situations and investment opportunities in northwestern Minnesota. The rather lengthy and complex contract that was eventually entered into was drafted by Hilton's attorney, although some of the provisions were suggested by the Nelsens after several hours of discussion between the parties. The Nelsens were not represented by an attorney until after they had signed the contract.

The contract, dated October 4, 1974, provided generally for the sale of the property to Hilton for $180,000. Shortly after signing, Hilton would place in escrow an earnest deposit of $2,500, with $49,700 to be paid at closing, and the sellers would accept a mortgage or deed of trust for the remaining $127,800. The mortgage or deed of trust was to mature 10 years from the date of closing. For the first 5 years there would be no payment on principal; only 7 percent interest would be due at the end of each of those years. At the end of the 6th, 7th, 8th, and 9th years principal payments in the sum of $2,000 were due and payable, and at the end of the 10th year the final balance of $119,800 was due and payable.

Under the contract the sellers could close on May 1, 1975, at their option, giving the purchaser 60 days' notice. If the sellers chose *not* to close on May 1, 1975, the parties were to close "at any date prior to May 1, 1976, by their mutual agreement, but [the contract provided] in any event closing shall not be later than May 1, 1976." Although the Nelsens thought they had signed a contract for deed, the agreement provided for title and possession to pass at closing.

Because the purchaser's performance was contingent on his ability to obtain an owner's title insurance policy without excep-

tions, Nelsen saw an attorney in March 1975 to help him clear certain title defects. After being advised by his attorney that the agreement was not a contract for deed, Nelsen instructed his attorney to tell Hilton that he would not close unless he had a contract for deed. On March 28, Nelsen's attorney sent Hilton's attorney a letter to this effect; the latter replied that if the Nelsens refused to close, Hilton would sue for specific performance as provided by the remedies clause of the contract.[1] Nelsen's attorney then advised Nelsen to attempt to close. The Nelsens then did decide to close, but this change of intent was not communicated to Hilton before the initial closing date of May 1, 1975.

The Nelsens were able to clear the defects in title, except for a real estate mortgage, a reservation of mineral rights by the State of Minnesota, and easements for existing public roads and underground telephone cables. At the end of April 1975, the Nelsens bought and moved to a farm in Nebraska. On May 7 or 8, 1975, Nelsen called Hilton from Nebraska and advised him that he was ready to close.

The evidence was in dispute as to this telephone conversation; the Nelsens claimed that Hilton demanded a reduction of $16,000 to close, and Hilton claimed that he could not recall such a conversation. But according to Phelps' contemporaneous notes, on May 14, 1975, Hilton told Phelps he would not close at that time without a reduction in the purchase price because it would be difficult for him to obtain a tenant farmer, it was already late spring, and the price of wheat was poor. Nelsen, believing that Hilton had defaulted, returned to Minnesota and made no further attempt to close. Nelsen farmed the land in 1975 but lost the crop.

In February 1976, Hilton's attorney wrote to notify Nelsen that Hilton would be ready

---

1. The contract provided that "all * * * parties who have signed said contract agree that in the event should [sic] any said party refuse to close said contract, that Purchaser shall have available to him the remedy of specific performance of damages at law, at Purchaser's option."

to close on May 1, 1976, the last closing date on the contract. The first notice was returned undelivered; a second notice was received by Nelsen on April 27, 1976. The next day, Nelsen's attorney wrote to Hilton's attorney informing him that Nelsen had decided not to sell the farm. Hilton then instructed his attorney to bring this action, which was filed on May 17, 1976.

Meanwhile, some time in April 1976, Phelps told Hilton that Nelsen's mortgage was about to be foreclosed. Hilton decided to try to purchase the mortgage at the upcoming foreclosure sale. At the sale on May 24, 1976, Hilton successfully bid $67,-000—the amount of the unpaid balance on the mortgage—and purchased it subject to the 1-year right of redemption. Nelsen continued to occupy and work the land throughout 1976.

On May 23, 1977, pursuant to a conversation with a law partner of Nelsen's attorney, defendant Lyle Mandt agreed to purchase the Nelsen farm by redeeming the mortgage. Mandt provided about one-half of the $73,885.94 needed for redemption and the law partner provided the other one-half. The Nelsens gave a quitclaim deed to Mandt and Mandt gave Nelsen an option to repurchase the property by January 1, 1978, for $121,074.05. Nelson farmed the property in 1977.

The trial court sitting without a jury found that the Nelsens had breached the contract, ordered specific performance for the plaintiff against both the Nelsens and Mandt, and ordered that plaintiff be allowed to deduct from the downpayment in the original agreement the sum of $39,600, representing the fair and reasonable rental value of the property during the years 1976 and 1977.

The basic issues presented to us for decision are:

1. Did plaintiff's attempt to obtain title through the mortgage foreclosure sale constitute an abandonment of the contract to purchase?

2. Was the contract one that was entitled to be specifically enforced?

3. Was the allowance for lost rents proper?

## 1. *ABANDONMENT OF THE CONTRACT*

Appellants claim that the purchaser Hilton is entitled to *no* remedy because he abandoned the contract. A finding of abandonment is required, they contend, because (a) Hilton stated that he intended to take title to their property by purchasing the mortgage at the foreclosure sale in May 1976; (b) Hilton did successfully bid and purchase the mortgage at the sale; and (c) Hilton stated that he would not have performed on the contract had Mandt not redeemed the property in May 1977.

Although the trial court refused the Nelsens' offer of proof concerning Hilton's intent to abandon the contract and made no specific finding regarding abandonment, it did deny a motion to amend the findings and conclusions such that an abandonment would be found. The trial judge's denial of that motion is tantamount to making findings contrary to those asked to be found. *Chopp v. Chopp*, 257 Minn. 526, 102 N.W.2d 318 (1960).

"Abandonment has been defined as a voluntary relinquishment of an interest by the owner with the intent of terminating his ownership. The intent may be shown by conduct." *Melco Investment Co. v. Gapp*, 259 Minn. 82, 85, 105 N.W.2d 907, 909 (1960); see, also, 1A Dunnell, Dig. (3 ed.) § 1. "Abandonment of a contract is a matter of intent, to be ascertained from the facts and circumstances surrounding the transaction out of which the abandonment is claimed to have resulted; consequently, it may be implied from the acts of the parties." 20 Dunnell, Dig. (3 ed.) § 5.02. See, also, *Ahlstrand v. McPherson*, 285 Minn. 398, 173 N.W.2d 330 (1969); and *Rognrud v. Zubert*, 282 Minn. 430, 165 N.W.2d 244 (1969).

 We cannot say that the trial court erred by refusing either to accept the offer of proof or to find an abandonment. The defendants offered no more than to elicit testimony that was already included in depositions admitted into evidence. The evidence did not require a finding of abandonment. Hilton had been notified only a few days before the final possible closing date, May 1, 1976, that Nelsen had decided not to sell. He promptly commenced the lawsuit by summons and complaint, filed May 17, 1976, and served on defendants Nelsen on May 20, 1976. Hilton never informed anyone that he was relinquishing his rights under the contract for sale. By purchasing the mortgage at the foreclosure sale, Hilton was simply protecting his contractual rights in the property against possible third-party purchasers and creditors of the sellers. Had the Nelsen mortgage not been redeemed by Mandt and had Hilton thereby acquired title to the farm, another result might be dictated, but we need not reach that question.

## 2. SPECIFIC PERFORMANCE

 Because the trial court's factual findings are reasonably supported by the evidence, they are not clearly erroneous and must be affirmed. Rule 52.01, Rules of Civil Procedure. Thus, we affirm the findings that the sellers materially breached the contract by their repudiation by letter on April 28, 1976, and their failure to close on May 1, 1976. However, it does not automatically follow that Hilton is entitled to specific performance of the contract, as ordered by the trial court. "[S]pecific performance of a contract to convey real estate is not a matter of absolute right, and if enforcement would be unconscionable or inequitable, performance will not be decreed." *Boulevard Plaza Corp. v. Campbell*, 254 Minn. 123, 136, 94 N.W.2d 273, 284 (1959). In this case, a combination of the following factors convinces us that ordering specific performance is not an appropriate exercise of the court's equitable discretion:

(a) Purchaser Hilton did not intend to farm or homestead on the land, but rather intended to rent the property to a tenant farmer. Because any equivalent parcel of Minnesota farmland would serve these investment purposes, the uniqueness of the land is less weighty here as a factor calling for specific performance, especially if damages at law are an adequate remedy for the sellers' breach. In this case, the plaintiff has not detrimentally changed his position in reliance upon the sellers' performance to such an extent that specific performance is necessary or a damages remedy inadequate. The plaintiff may easily be compensated in damages for losses occasioned by this contractual relationship.

(b) There were elements of unfairness, or at least overreaching, in the contract itself. See, *Ross v. Carroll*, 156 Minn. 132, 194 N.W. 315 (1923); *Abbott v. Moldestad*, 74 Minn. 293, 77 N.W. 227 (1898).

First, the contract lacked mutuality of remedy. Although that alone will not render specific performance inequitable, *Lamprey v. St. Paul & Chicago Ry. Co.*, 89 Minn. 187, 94 N.W. 555 (1903), mutuality is one element which may be considered in determining whether to award specific performance. See, *Austin v. Wacks*, 30 Minn. 335, 15 N.W. 409 (1883).

Here, according to the contractual provisions, the sellers' only remedy in the event of default by the purchaser would be the retention of $2,500 earnest money as liquidated damages. If the sellers defaulted, however, the purchaser could elect either specific performance or damages as a remedy. Also, the contract requires the part-purchase money note for $127,000 and the mortgage or deed of trust securing the note to provide that if the purchaser defaults, "no deficiency or other money judgment" could be "sought or obtained" against the purchaser by the sellers. "Unless there is a mutuality of remedy at the time coercion is sought so that the decree will bind both parties and accomplish a full performance of the contract, the court refuses to exert

its equitable powers and leaves the parties to their remedy at law." *Reichert v. Pure Oil Co.*, 164 Minn. 252, 259, 204 N.W. 882, 884 (1925).

Second, the contract was subject to unilateral termination by the purchaser for a variety of reasons, including inability to obtain a tenant farmer; unfavorable soil test results; or rejection of the legal form of the documents to be provided by the sellers, such as the mortgage or deed of trust and the purchase money note. In the event of such a unilateral termination, the purchaser would recover the earnest money and neither party would "have any further rights or liabilities" under the contract. As this court said in *Reichert v. Pure Oil Co.*, *supra*:

> " * * * [A] court of equity will not enforce performance of a continuing contract if the contract permits the party seeking such enforcement to terminate it at will, but will leave him to his remedy at law. * * *
>
> * * * * * *
>
> " ' * * * The reservation of the right to cancel is not an infirmity which renders the contract void *ab initio*, but it deprives the party for whose benefit it is made, of relief in equity in the nature of a specific performance.' [Citation omitted.]
>
> * * * * * *
>
> " * * * [T]he court will not decree performance unless it can compel performance by both parties, and it cannot compel performance by the plaintiff as he could avoid the decree at any time by revoking the contract. * * * " 164 Minn. 256, 258, 259, 204 N.W. 883, 884.

In fact, unfulfilled conditions to the plaintiff's performance exist which to this day have not been explicitly waived by the plaintiff and which thus could result in termination of the contract. For example, the plaintiff would have the right to terminate the agreement if the sellers were unable to deliver a warranty deed or if the plaintiff were unable to obtain an owner's title insurance policy without exceptions. The plaintiff has not explicitly waived this condition, yet title to the land was subject to easements for roads and telephone cables and to the State of Minnesota's mineral rights. These clouds on the title would be difficult, if not impossible, to erase. Because the defendant-sellers' interests in the plaintiff's performance thus could not be secured in an equitable award of specific performance, the presence in the contract of such unfulfilled and unwaived conditions militates against ordering specific performance.

Third, the payment terms evidenced overreaching by the purchaser. Of a total contract price of $180,000, the purchaser need only pay $2,500 into escrow as an earnest deposit and $49,700 cash upon closing—a total of $52,200 paid when the title transferred. The remaining $127,800 was to be financed by a part-purchase money note secured by a 10-year mortgage or deed of trust to the sellers. Prior to the end of the 10th year, the sellers' only return would be interest on the unpaid amount at 7 percent annually plus $2,000 a year in the 6th through 9th year of the contract. Thus, apart from interest, the sellers would receive during 9 years and 11 months only $60,200 toward property worth $180,000, while the purchaser would be receiving rental income on the land which, the trial court found, had a median rental value of approximately $20,000 per year. And, as mentioned above, if the purchaser were to default on the payments, the sellers would have no action for a deficiency judgment on the unpaid purchase price.

(c) The testimony in evidence indicated that the basic terms of the contract were misunderstood by the defendants. Significantly, the defendant-sellers were not represented by an attorney in negotiations

with plaintiff-purchaser.[2] The contract, which was lengthy and complex, was drafted and explained to the Nelsens by the plaintiff's attorney. Additional handwritten paragraphs, some designed to accommodate the Nelsens' uncertainty at time of drafting concerning how long it would take to make the necessary arrangements to close, were dictated by plaintiff's attorney. Only when the Nelsens consulted an attorney for assistance in clearing the title did they learn that the contract was not a contract for deed, as they had thought it was. The Nelsens erroneously understood that May 1, 1975, was the *only* closing date under the contract. They also thought, incorrectly, that Hilton's initial payment would pay off their mortgage. They did not understand that for 5 years they would receive only 7 percent interest on the purchase price, no payments on the principal, and that $119,800 would be owing on the purchase price at the end of the 10th year.

" * * * [I]f the contract as written is the result of mistake so fundamental that the minds of the parties have never met * * * and the parties can be restored to their original status, a court administering equity will not enforce the contract. *Buckley v. Patterson*, 39 Minn. 250, 39 N.W. 490 [1888]." *Bredesen v. Nickolay*, 147 Minn. 304, 305, 180 N.W. 547 (1920).

(d) Circumstances have arisen since the formation of the contract which further undermine the fairness of specific performance. See, e. g., *Enkema v. McIntyre*, 136

Minn. 293, 296, 161 N.W. 587, 588, 2 A.L.R. 411, 414 (1917).[3] See, also, *Abbott v. Moldestad, supra.* Third-party interests have intervened by way of Mandt's redemption of the property. Mandt now has legal and equitable title to the property.[4] There was no finding that Mandt had personal knowledge of Hilton's rights under the October 4, 1974, contract. The contract for sale was not recorded, and Mandt testified that he had no knowledge of the contract. If he did not, specific performance of the contract would necessarily be subject to Mandt's property rights.

■ In light of the totality of the circumstances discussed above, we conclude that, as a matter of law, this contract is not one which the court in its equitable discretion may specifically enforce. Plaintiff must seek his remedy at law. We do not mean to suggest that any one of the factors discussed above is necessarily sufficient to render specific performance inequitable. Considering them together, however, we feel compelled to the decision we have reached, which is necessarily limited to the narrow facts presented here.

3. *DAMAGES*

■ Having concluded that the contract is not specifically enforceable and that plaintiff's remedy is at law, we need not reach the question of whether an allowance for lost rents was properly awarded by the trial court, which sat in equity rather than at law. Accordingly, we reverse the judg-

---

2. Dale Nelsen testified that when he asked if they needed a lawyer, Archie Wilson (Phelps' agent who was present at the negotiations and signing) said, "No," and that they did not read the provisions of the contract verbatim, but, rather, Wilson, Hilton, and Hilton's attorney explained the contract to them. Hilton and Wilson testified that the Nelsens said they understood the contract before they signed it.

3. " * * * If * * * circumstances have arisen which render specific performance inequitable, relief will be denied. *Buckley v. Patterson*, 39 Minn. 250, 39 N.W. 490 [1888]. 'The situation involved should be considered from a practical, rather than a theoretical, view point.'

*First Nat. Bank v. Corporation Securities Co.*, 128 Minn. 341, 348, 150 N.W. 1084 [1087] [1915]." *Enkema v. McIntyre*, 136 Minn. 293, 296, 161 N.W. 587, 588.

4. Defendants Nelsen have indicated to us, in their "Response to Respondent's Motion for Dismissal" (filed 3/15/78) that they have brought an action to declare their transaction with Mandt an equitable mortgage. If the Nelsens prevail in that action, then Mandt would not have legal title to the property, but he would still have an equitable interest.

ment and, because the first trial was in equity, remand this case for a new trial at law on the question of damages.[5] The parties, of course, may demand a jury trial on this issue.[6]

Affirmed in part, reversed in part, and remanded.

TODD, J., took no part in the consideration or decision of this case.

5. The measure of damages was not argued before the trial court or on appeal. However, without so holding, we observe that the measure of damages appears to be the difference between the market value of the land on May 1, 1976, and the contract price of $180,000, plus such additional expenses as the purchaser may reasonably have incurred to that date in a bona fide attempt to comply with the contract.

6. The record is not clear as to whether jury trial was waived on all issues below. Regardless, our decision that the contract is not specifically enforceable requires a new opportunity to elect a jury trial.