In re LANDMARK HOLDING
COMPANY, LTD.,
Debtor.

Landmark Holding Company,
Ltd., Plaintiff,

v.

WLW Real Estate, L.L.P., Defendant.

Bankruptcy No. 02–42087.
Adversary No. 02–4170.

United States Bankruptcy Court,
D. Minnesota.

Dec. 12, 2002.

Joseph W. Dicker, Minneapolis, MN, for plaintiff.

Steven E. Ness, Henretta, Cross, Ness & Dolan, Minnetonka, MN, for defendant.

Robert B. Raschke, U.S. Trustees Office, Minneapolis, MN, trustee.

## MEMORANDUM ORDER GRANTING SPECIFIC PERFORMANCE

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for trial on December 2, 2002. Joseph W. Dicker appeared for the plaintiff and Steven E. Ness appeared for the defendant.

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a), and Local Rule 1070–1. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

### BACKGROUND

In February of 2001, Landmark entered into a purchase agreement with WLW to purchase approximately 178 acres of undeveloped farmland [1] located near Montrose, Minnesota for the purpose of developing single and multi-family residential dwellings. The original purchase price was $970,000. WLW was to retain approximately twenty acres as farmland and an additional fifteen acres as commercial property.

The purchase agreement required Landmark to escrow $20,000 with the Dakota County Abstract. Landmark never made the deposit. Landmark maintains that the $20,000 was not paid into escrow because the development possibility of the property was lessened due to the discovery that the land was not contiguous to the City of Montrose. The purchase agreement scheduled a closing date on or before September 20, 2001. The agreement, which allowed Landmark full access to the sub-

---

1. At the time the purchase agreement was entered into, the land was thought to be contiguous to the city. Later, it was discovered that one acre separated the WLW property from the city borders. Without this acre and the cooperation of its owner, the City of Montrose could not annex the WLW property.

ject property to conduct survey work required to submit plans to the City of Montrose for residential development, was contingent upon annexation by the City of Montrose and upon Landmark gaining final plat approval from the City of Montrose, Marysville Township, and Wright County.

From February through September 2001, Landmark worked on the annexation process, engineering and hydrology studies, surveys, and plat designs. Meanwhile, on May 7, 2001, Landmark filed for Chapter 11 relief. It did not list the purchase agreement or the subject property as an asset[2], and did not notify WLW of its bankruptcy filing. The case was dismissed on August 22, 2001.

Because the necessary development work was not complete, the September 30, 2001 closing did not occur, the annexation process took substantially longer than originally contemplated, and the initial term of the purchase agreement expired. During November and December of 2001, Landmark negotiated the terms of a joint venture for development of the commercial portion of the property with Bridgeland Development Company. Under this agreement, Landmark agreed to sell the subject property to Bridgeland. Landmark thereafter undertook negotiations with WLW to amend the purchase agreement. In February of 2002, the purchase agreement was amended by increasing the purchase price to $1,015,000 and extending the closing date until March 31, 2002. The $20,000 Landmark was required to escrow was not mentioned in the amended purchase agreement. However, the parties negotiated a "side deal" in consideration

for the amended purchase agreement, in which Landmark would pay $20,000 to WLW. WLW wanted the $20,000 excluded from the amended purchase agreement so that the bank holding the mortgage on the WLW property would not know about the payment of this sum. Landmark's attorney and WLW assumed that the $20,000 deposit had been made and the side deal discussed in their correspondence called for the deposit to be released to WLW. Landmark, however, intended to simply pay the $20,000. Because payment was contingent on certain events which did not occur, the payment was never made. From October through March 2002, Landmark continued to work on the annexation, platting and related issues.

The March 31, 2002 closing did not occur. WLW was notified that a closing was scheduled by Landmark for April 12, 2002. However, Landmark failed to appear at that closing, and the sale was not completed. From February through June of 2002, WLW was unable to pay its mortgage payments on the property, and it executed an agency agreement with Shingobee Realtors for the sale of the Montrose property. On June 12, 2002, WLW signed a purchase agreement with Lyman Development, Inc., for substantially the same property for approximately $1,700,000. This purchase agreement contemplated a closing in February or March of 2003.

Determined to cancel the land contract with Landmark, WLW commenced statutory cancellation proceedings. In May of 2002, it served on Landmark by publication a Notice of Cancellation of the purchase agreement. This Notice required

---

2. Michael Crosby, the President of Landmark, testified that he did not include the purchase agreement in his schedule of assets because he did not know it was an asset, and there was a question about whether the purchase agreement would ever be performed and thus viable. He now admits that the failure to list the debtor's interest in the property was a mistake.

Landmark to close on or before June 15, 2002.

On June 14, 2002, Landmark filed a second petition under Chapter 11. On July 1, 2002, Landmark filed a motion to assume the purchase agreement and the Bridgeland sale agreement. On July 8, 2002, WLW filed a motion to dismiss Landmark's case because Landmark did not notify WLW of its first bankruptcy, and because the $20,000 escrow money had never been paid. On this same date, WLW and Lyman Development Co. amended their purchase agreement by extending the closing deadline until WLW successfully completed statutory cancellation proceedings with Landmark. On July 15, 2002, WLW's and Landmark's motions were settled by a stipulation, which raised the purchase price again to $1,085,000 and established a closing date on or before August 10, 2002. Landmark scheduled a closing for August 2, 2002. Before closing, Landmark discovered that three mechanic's liens were filed against the property in May through June of 2002. The liens were for work ordered by WLW on the property it would retain and such liens, as of August 2, 2002, totaled approximately $47,696.

During this time, Landmark negotiated with the bank that held the mortgage for a release of its mortgage. Although no final agreement was reached with the bank, the bank agreed in principle to release its mortgage if it received all of the net proceeds of the sale. Landmark also negotiated with the mechanic's lien claimants in an attempt to facilitate closing. WLW made only perfunctory attempts to resolve these issues and did not appear at closing.

Subsequently, additional mechanic's liens were filed. Recent litigation between WLW and the mechanic's lien holders has settled the liens for $107,000, although it is unclear whether they remain unpaid. Litigation between WLW and the bank holding the mortgage on the WLW property has been settled to agree on a debt to the bank for $122,700.

## THE ISSUES

■ Landmark argues that it is entitled to specific performance directing WLW to perform under the purchase agreement. WLW asserts bad faith (in the form of fraud), inequity, unclean hands, and impossibility to argue why Landmark is not entitled to specific performance. WLW seems to confuse the issue of whether the contract is enforceable with the issue of whether specific performance is the appropriate remedy. Specific performance is an equitable remedy but in order for a court to decide whether that remedy is appropriate, the first issue that must be addressed is whether the underlying contract is enforceable. Fraud and impossibility are defenses to the enforcement of the purchase agreement between Landmark and WLW. Inequity and the defense of unclean hands are factors that relate to the issue of whether the remedy of specific performance should be granted. For reasons stated in this opinion, I find that Landmark is entitled to enforcement of its contract and is also entitled to the equitable remedy of specific performance.

## DISCUSSION

### FRAUD

■ WLW alleges that Landmark committed fraud in a variety of ways. First, WLW argues that Landmark knew for a period of over one and one-half years that it had not deposited the $20,000 required by the purchase agreement, yet WLW states it was led to believe that Landmark had deposited the $20,000. WLW argues that it relied on this misrepresentation by Landmark to believe there was a binding

agreement between the parties when in fact there was not a binding agreement. WLW further argues that in an effort to disguise its poor financial status, Landmark did not include the purchase agreement with WLW as an asset in its May 2001 Chapter 11 bankruptcy proceeding and did not notify WLW of the filing WLW argues that the failure of Landmark to notify it of the bankruptcy filing led WLW to believe that the September 11 terrorist attack, rather than the bankruptcy, was the reason why Landmark could not close by September 30, 2001.

■ First, I note that WLW must prove fraudulent inducement in the formation of the contract in order to discharge its obligation to perform that contract. To establish fraudulent inducement, there must be (1) a representation; (2) the representation must be false; (3) the representation must have to do with a present or past fact; (4) that fact must be material; (5) it must be susceptible of knowledge; (6) the representer must know it to be false or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false; (7) the representer must intend to have the other person induced to act, or justified in acting upon it; (8) that person must be so induced to act or so justified in acting; (9) that person's action must be in reliance upon the representation; (10) that person must suffer damage; (11) that damage must be attributable to the misrepresentation, that is, the statement must be a proximate cause of the injury. *M.H. v. Caritas Family Services,* 488 N.W.2d 282, 289 (Minn.1992) (citing *Florenzano v. Olson,* 387 N.W.2d 168, 174 n. 4 (Minn.1986)); *Digital Resource, L.L.C. v. Abacor, Inc. (In re Digital Resource, L.L.C.),* 246 B.R. 357, 367 (8th Cir. BAP 2000).

WLW has not proven the elements of fraudulent inducement. First, Landmark did not make a false representation of present or past fact with the intent to induce WLW to enter into the purchase agreement. All of the acts WLW alleges are fraudulent occurred *after* the purchase agreement was entered into. In any event, Landmark did not commit fraud.

■ First, while Landmark's failure to deposit the $20,000 may have been a breach of the purchase agreement, it was not fraud. Additionally, WLW waived that breach and any others committed by Landmark when it entered into the court-approved stipulation on July 15, 2002. "A party's continued recognition of a contract as binding after the other party's alleged breach acts as a waiver of that breach." *Creative Communications Consultants, Inc. v. Gaylord,* 403 N.W.2d 654, 657 (Minn.App.1987) (citing *Wolff v. McCrossan,* 296 Minn. 141, 210 N.W.2d 41, 43 (1973)).

■ Landmark's failure to list the purchase agreement with WLW as an asset on its bankruptcy schedules was not done with fraudulent intent designed to induce WLW to act or forebear from acting. Even if this omission was fraudulent, WLW did not suffer any damage from it, due to the relatively quick dismissal of Landmark's first bankruptcy case. Finally, even if fraudulent misrepresentations were made by Landmark, there was no justifiable reliance by WLW. Landmark's conduct was certainly well known by WLW when it agreed to the court-approved stipulation. "Claimed reliance that is without right, that is unreasonable, or that is unjustified is in reality not reliance at all since those elements are inherent to the concept of reliance itself." *Facility Planning, Inc. v. King (In re King),* 68 B.R. 569, 572 n. 7 (Bankr.D.Minn.1986). A party who may avoid a contract for fraud ratifies it by accepting and retaining the benefits of it. *Proulx v. Hirsch Brothers,*

*Inc.,* 279 Minn. 157, 155 N.W.2d 907, 912 (1968).

## IMPOSSIBILITY

WLW argues that the contract should not be enforced because of the impossibility of performing it. The purchase agreement requires WLW to transfer the property to Landmark free and clear of all encumbrances, and requires Landmark to pay WLW $1,080,000 for the property. WLW's current obligation to its mortgagee is $1,222,700 and mechanic's liens totaling $107,000 have been filed on the property, and perhaps remain unpaid. WLW argues that in order for it to transfer title to Landmark free and clear of all encumbrances, it must pay an amount in excess of$250,000 more than it is receiving from Landmark. Thus, WLW argues, it cannot comply with the terms and conditions of the stipulation.

■ In order for WLW's impossibility argument to succeed WLW must prove that (1) performance of the contract is impracticable; (2) without WLW's fault; and (3) by the occurrence of an event, the nonconcurrence of which was a basic assumption on which the contract was made. *U.S. v. Winstar Corp.,* 518 U.S. 839, 904–905, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (quoting Restatement (Second) of Contracts § 261); *Seaboard Lumber Co. v. U.S.,* 308 F.3d 1283, 1295 (Fed.Cir.2002); *City of Savage v. Formanek,* 459 N.W.2d 173, 176 (Minn.App.1990). "If the risk was foreseeable, there should have been a provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed." *Winstar Corp.,* 518 U.S. at 905, 116 S.Ct. 2432 (quoting *Lloyd v. Murphy,* 25 Cal.2d 48, 54, 153 P.2d 47, 50 (1944)); *see also* Restatement (Second) of Contracts § 261. Increased cost of performance does not ordinarily constitute impossibility. *W.R.*

*Grace and Co. v. Local Union 759, Intern. Union of United Rubber, Cork, Linoleum and Plastic Workers of America,* 461 U.S. 757, 769, n. 12, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *Megan v. Updike Grain Corp.,* 94 F.2d 551, 554 (8th Cir.1938) (stating that the doctrine of frustration or impossibility does not apply to a situation so as to excuse performance where performance is not practically cut off, but only rendered more difficult or costly); *Oliver–Electrical Mfg. Co. v. I.O. Teigen Const.,* 177 F.Supp. 572, 576 (D.C.Minn.1959) (stating that even under the liberal view tending to recognize great hardship as the equivalent of legal impossibility, the impossibility must arise from facts the promisor *had no reason to anticipate)* (emphasis added). The defense of impossibility is traditionally unavailable where the barrier to performance arises from the act of the party seeking discharge. *Winstar Corp.,* 518 U.S. at 895, 116 S.Ct. 2432.

■ The events which led to the alleged increased costs of performing the contract were not only fully anticipated and known by WLW, but such events were also occasioned by WLW. Although the three mechanic's liens were filed on the WLW property after the stipulation was entered into by WLW and Landmark, WLW knew or should have known that such liens, as well as additional subsequent liens, would be filed for work it commissioned on the acres it sought to retain after the closing with Landmark. WLW knew about the mortgage and its approximate amount. In fact, from the very beginning the purchase price was never enough to satisfy the mortgage. Clearly WLW contemplated negotiations with the bank to release its mortgage on the transferred acreage, while keeping its mortgage on the remaining land, a resolution which the bank has entertained already. It is also possible for WLW to use other assets

or borrow money to make up the shortfall. While complying with its obligation may be unpleasant or expensive, it is not impossible.

## SPECIFIC PERFORMANCE

 Having held that the agreement is enforceable, I now turn to the issue of whether the remedy of specific performance should be granted. Specific performance is an equitable remedy which compels performance of a contract. 3 Dan B. Dobbs, *Law of Remedies* 189–190 (2d ed.1993). A request to compel the specific performance of a contract is an application of the sound discretion of the court. *Pope Mfg. Co. v. Gormully*, 144 U.S. 224, 237, 12 S.Ct. 632, 36 L.Ed. 414 (1892); *Fred O. Watson Co. v. United States Life Ins. Co. in City of New York*, 258 N.W.2d 776, 778 (Minn.1977). Courts consider five factors in determining whether to grant specific performance of a real estate purchase agreement: (a) the contract must be established by clear, positive, and convincing evidence; (b) it must have been made for adequate consideration and upon terms which are otherwise fair and reasonable; (c) it must have been induced without sharp practice, misrepresentation, or mistake; (d) its enforcement must not cause unreasonable or disproportionate hardship or loss to the defendants or to third persons; and (e) it must have been performed in such a manner and by the rendering of services of such a nature or under such circumstances that the beneficiary cannot be properly compensated in damages. *Johnson v. Johnson*, 272 Minn. 284, 137 N.W.2d 840, 847 (1965); *Saliterman v. Bigos*, 352 N.W.2d 494, 496 (Minn.App.1984). Lack of mutuality of remedy alone does not render specific performance inequitable. *Hilton v. Nelsen*, 283 N.W.2d 877, 881 (Minn.1979).

 Specific performance will not be decreed when it would be inequitable. *Buckley v. Patterson*, 39 Minn. 250, 39 N.W. 490 (1888). A party does not have an automatic right to specific performance as a remedy for breach of a contract, the court must balance the equities of the case and determine whether the equitable remedy of specific performance is appropriate. *Pope Mfg. Co.*, 144 U.S. at 237, 12 S.Ct. 632; *Dakota County HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn.1999) (citing *Boulevard Plaza Corp. v. Campbell*, 254 Minn. 123, 94 N.W.2d 273, 284 (1959)). It is a well-established rule that "unless he who seeks the aid of equity in enforcing a contract for the conveyance of land shall have been prompt, ready and eager to perform upon his part and have exercised good faith and been diligent, the relief demanded should be denied him." *Boulevard Plaza Corp.*, 94 N.W.2d at 283.

 All of the factors used to determine whether specific performance should be granted have been met by Landmark. Landmark has demonstrated good faith and was ready and eager to perform the contract according to the dictates of the court-approved stipulation. Moreover, because the real estate at issue is unique, damages will not provide Landmark with an adequate remedy. As the Minnesota Supreme Court stated:

> Equitable relief has usually been denied where the court in its discretion has found the common law remedy to be adequate. Where, however, an interest in land is involved, we have an exception to this rule that is significant in illustrating the special status accorded to land as distinguished from other forms of property... "Damages for the breach of a contract for the sale and purchase of any interest in land is always considered inadequate, without regard to the size, value or location of the land or the possi-

bility of getting other land substantially equivalent. The crystallization of this rule is probably due historically to the peculiar respect and consideration which has been accorded to land in English law; its modern justification is that because there is no open market for land either for the seller or buyer, the number of instances where the buyer could get land substantially as satisfactory or where the vendor could make a ready sale to another purchaser is so small as to be negligible." In short, inadequacy of damages is presumed and proof thereof is not required. *Shaughnessy v. Eidsmo,* 222 Minn. 141, 23 N.W.2d 362, 368 (1946) (quoting Clark, Principles of Equity, § 42); *see also Wilhite v. Skelton,* 149 F. 67, 72 (8th Cir.1906) (stating that an action for damages does not afford an adequate remedy for breach of a contract to sell or convey real estate because it will not place the parties in the same situation in which they were before the agreement was made, and it is not as prompt, complete, and efficient as in a suit in equity for specific performance). Furthermore, Landmark has a reciprocal obligation to sell the subject property to Bridgeland. Money damages simply will not enable Landmark to meet its obligations under its purchase agreement with Bridgeland. Finally, there is insufficient evidence to show that requiring WLW to perform under the contract would cause it inequity, or disproportionate hardship.

### UNCLEAN HANDS

■■■ WLW argues that Landmark's unclean hands also must preclude my granting Landmark specific performance. The equitable defense of unclean hands, encapsulated in the maxim "one who comes into equity must come with clean hands," is premised on withholding judicial assistance from a party guilty of unconscionable conduct. *Fred O. Watson Co.,*

258 N.W.2d at 778. Under Minnesota law, the plaintiff may be denied relief to or from conduct which is fraudulent, illegal or unconscionable by reason of bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury of others. *Johnson v. Freberg,* 178 Minn. 594, 228 N.W. 159, 160 (1929); *Foy v. Klapmeier,* 992 F.2d 774, 779 (8th Cir.1993). The misconduct need not be of such a nature as to be actually fraudulent or constitute a basis for legal action. *Johnson,* 228 N.W. at 160. The maxim he who comes into equity must come with clean hands is not applied by way of punishment for an unclean litigant but upon considerations that make for the advancement of right and justice. *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933). It is not a rigid formula which trammels the free and just exercise of discretion. *Id.*

■■■ Landmark's acts have not been fraudulent, illegal or so unconscionable as to warrant denial of specific performance. Moreover, Landmark's conduct was well known to WLW when it entered into the bankruptcy stipulation on July 15, 2002. As a result, any claim of unclean hands was waived.

### ORDER

THEREFORE, IT IS ORDERED that:

The defendant shall perform under the purchase agreement with the plaintiff, as amended.

LET JUDGMENT BE ENTERED ACCORDINGLY.