GAJARSA, Circuit Judge,
concurring.
I join in the judgment of the court, however, I reach the judgment by a different road. I would find that the trial court erred in construing Claim 1 of the ’723 patent. Under the correct construction, SmithKline Beecham (“SKB”) has proven a prima facie case that Apotex’s product will infringe Claim 1. Claim 1, however, is invalid because it encompasses subject matter that is unpatentable under 35 U.S.C. § 101.[1] I would affirm the district court’s judgment in favor of Apotex on the basis that Claim 1 encompasses unpatentable subject matter pursuant to § 101 contrary to the finding of the majority that claim 1 is invalid pursuant to § 102(b). Although the majority outlines the factual background, I deem it necessary to add more specificity to the historical background.
In the 1970s, scientists at the Danish company of A/S Ferrosan (“Ferrosan”) first synthesized a new class of chemical compounds. At least some of these compounds were reported to selectively inhibit the reuptake of serotonin, a naturally occurring chemical in the brain. Several commercial antidepressants common at the time inhibited the neuronal reuptake of serotonin. Ferrosan’s laboratory tests indicated that its new compounds inhibited serotonin-uptake in a manner comparable to that exhibited by these existing antidepressant drugs.
Ferrosan applied for, and on February 8, 1977, was assigned, U.S. Patent No. 4,007,196 (“the ’196 patent”). Paroxetine was among the compounds that Ferrosan discovered and that the 196 patent protected. In 1980, Ferrosan granted Beec-ham Group Limited (now part of SKB) an exclusive license to make, to have made, to use, and to sell paroxetine throughout the world (save for specified Scandinavian countries).
In 1981, SKB began manufacturing pa-roxetine hydrochloride in its Harlow (U.K.) plant. These early manufacturing activities did not lead to a commercial product immediately. Before a new pharmaceutical drug can be placed on the U.S. market, it must undergo elaborate testing for safety and efficacy. Quantities of paroxetine hydrochloride were distributed to different parts of the world, including the U.S., for use in clinical trials. SKB scientists also experimented with paroxetine hydrochloride in its bulk form (i.e., its form prior to being made into pills) to improve the production of the bulk material.
SKB’s experimentation on bulk form pa-roxetine led to an important discovery. On May 29, 1985, an SKB scientist named Alan Curzons issued a memorandum entitled “Paroxetine Polymorphism.” In the memorandum, Curzons stated that paroxe-tine “had been shown to exist in two discreet [sic] crystalline polymorphic FORMS,” a stable, nonhygroseopic hemih-ydrate and a hygroscopic anhydrate. Cur- *1348 zons’s tests confirmed that the anhydrate and the hemihydrate were indeed distinct crystalline forms of paroxetine.
Crystallinity is central to understanding both Curzons’s reference to polymorphism and this case. “Polymorphs” are distinct crystalline structures containing the same molecules. These structural differences can affect various properties of the crystals, such as melting points and hardness (e.g., graphite and diamonds are both crystalline forms of carbon). The two forms of paroxetine hydrochloride that Curzons discovered were technically “pseudopoly-morphs,” though pseudopolymorphs are often loosely called polymorphs (an apparently common looseness that the district court adopted and that I have retained in this opinion). Pseudopolymorphs not only have their molecules arranged differently but also have a slightly different molecular composition. A common type of pseudopo-lymorph is a solvate, which is a crystal in which the molecules defining the crystal structure “trap” molecules of a solvent. The crystal molecules and the solvent molecules then bond to form an altered crystalline structure. When the trapped and bonded solvent is water, the solvate is called a hydrate. Hydrates bonding one water molecule to every two of the other molecules constituting the unit crystal cell are called hemihydrates. Paroxetine hydrochloride hemihydrate (“paroxetine hemihydrate”) is a crystalline structure binding one water molecule to every two paroxetine hydrochloride molecules. Despite the presence of water molecules, a hemihydrate is a solid, a powder, at room temperature.
Prior to Curzons’s discovery, the only known form of paroxetine hydrochloride had been an anhydrate, a crystalline form of paroxetine that does not contain a bound water molecule. In May 1985, Cur-zons made a batch of paroxetine, added isopropyl alcohol, a solvent, and found that the batch crystallized as a hemihydrate rather than as an anhydrate. Curzons immediately recognized the significance of the hemihydrate — its superior handling properties' — as well as its potential for a new patent relating to those properties.
These superior handling properties are natural effects of water bonded into the paroxetine hemihydrate. The anhydrous form of crystalline paroxetine hydrochloride (“paroxetine anhydrate”) is hygroscopic; that is, it attracts water. This water is not attached to the paroxetine anhydrate by molecular bonds. As a result, the water is easily dispersed by heating paroxetine anhydrate at a significantly lower temperature than would be required to liberate the water molecule bound in paroxetine hemihydrate crystals. The an-hydrate’s hygroscopicity makes it difficult to handle in the manufacturing process; measures must be taken to control humidity and other sources of moisture, lest “soggy” anhydrate degrade into other compounds in ways that might impair the safety or the efficacy of the product. Because the hemihydrate is not hygroscopic, it is easier to handle with fewer precautionary measures protecting its safety and efficacy.
Beecham applied for a British patent on Curzons’s discovery on October 25, 1985, and for a U.S. patent on October 23, 1986. On January 26, 1988, the U.S. Patent and Trademark Office (PTO) issued the ’723 patent, entitled “Anti-depressant Crystalline Paroxetine Hydrochloride Hemihyd-rate,” which, according to the Abstract, “provides crystalline paroxetine hydrochloride hemihydrate, processes for its preparation, compositions containing the same *1349 and its therapeutic use as an anti-depressant.” ’723 patent.
The claims as issued were identical to those in the original application. The ’723 patent combines product claims (Claims 1, 2, 3, and 5), process claims (Claim 4), and use claims (Claims 5 and 6). Only Claim 1 is at issue in the current litigation. It reads:
1. Crystalline paroxetine hydrochloride hemihydrate.
Subsequent experimentation taught SKB a few additional lessons about parox-etine hemihydrate. First, SKB learned that hemihydrate likely existed at least as early as December 1984 (and possibly earner), even though Curzons did not identify it as such until 1985. Second, and more significantly, SKB learned that the two forms of paroxetine are related through a phenomenon known as “disappearing poly-morphs.” [2] At times, the appearance of a new polymorph (or pseudopolymorph)— hemihydrate — may affect the process that was previously used to make the old poly-morph — anhydrate. The result is such that the same process will no longer produce the old polymorph — at least (as here) in its pure form.
The causal mechanism of polymorphic creation and transformation is not clear. Modern science does not yet understand the full complexity of the atomic interactions at play in the phenomenon of polymorphism, and specifically in the disappearance of some polymorphs. Scientists have, however, identified three factors believed to be significant. First, later-appearing polymorphs tend to be more stable than earlier ones. Because a stable crystalline form is not as likely to change into a less stable one than vice versa, there tends to be a “natural” drift toward more stable polymorphs. Second, impurities retard crystallization, including crystallization into new forms. Technological progress in manufacturing — including chemical manufacturing — has allowed manufacturers to reduce the impurities in their products. Because of this increased purity technology creates increasingly favorable conditions for the. “natural” drift towards stability. Third, and most significantly to this case, once a new and more stable crystal emerges, should, it be mixed, even in very small quantities, with the old, less stable crystal, the old form may convert to the new.
This process of “seeding” a batch of the old crystalline structure with its new, stable polymorphs can serve as a method of manufacturing the new polymorph by “converting” the old into the new. Seeding and conversion can also be accidental side-effects of new, stable crystals becoming airborne and “contaminating” the laboratory or plant in which the old crystal is being manufactured. While controlled conversions in the former case are obviously desirable production methods, natural conversion in the latter case may be undesirable interferences with the production of the old polymorph.
Seeding and conversion are central to this case. A single crystal of paroxetine hemihydrate can seed an environment to induce conversion — and to render the production of pure paroxetine anhydrate in *1350 that environment impossible. While it is often possible, at least in theory, to build clean unseeded environments in which the old process will produce pure forms of the original polymorph, that possibility often remains only a matter of theory; seeds introduced into the environment frequently permeate all parts of the globe and render it impossible to develop such clean environments. No one knows whether it is possible today to build clean environments in which a pharmaceutical company could produce pure paroxetine anhydrate. Nor, for that matter, is anyone certain precisely what caused the first crystal of paroxetine hemihydrate to form — though it does appear likely that a crystal from that December 1984 batch of paroxetine hemih-ydrate seeded Curzons’s laboratory prior to his initial identification of the paroxetine hemihydrate polymorph.
As noted, scientific uncertainty surrounds the entire phenomenon of disappearing polymorphs, as well as its particular manifestation in paroxetine. Apotex’s expert,[3] in fact, testified that the phenomenon does not manifest itself in paroxetine, and that paroxetine anhydrate and paroxe-tine hemihydrate can coexist happily in a single batch of paroxetine.
After weighing the testimony of all of the experts, the district court hypothesized that while the presence of paroxetine hem-ihydrate seeds in a batch of paroxetine anhydrate is likely, only a small percentage of the paroxetine anhydrate is likely to convert to hemihydrate under normal conditions of humidity, temperature, or pressure. The district court continued to hypothesize that given enough humidity, heat, or pressure, conversion may continue until it reaches 100 percent, and that by the same token, with much tighter controls less, maybe no, conversion will take place despite the presence of seeds. Finally, the district court noted that the clearest case of limited conversion occurs where there are no water molecules in the environment of the anhydrate.
For the purposes of this ease, the district court admitted all proffered expert testimony concerning both disappearing polymorphism as a scientific phenomenon and its applicability to paroxetine, and found it to be a credible explanation of various factual occurrences in the discovery and the spread of paroxetine hemihyd-rate.
This language is all straightforward, and Claim 1 — containing only four words — is the most straightforward of all. The plain language of a claim asserting rights to “crystalline paroxetine hydrochloride hem-ihydrate” claims any amount of “crystalline paroxetine hydrochloride hemihyd-rate.” The plain language of this claim is precisely the “single crystal” theory that the district court rejected on other grounds. The district court explicitly recognized that the claim’s plain language included even a single crystal of hemihyd-rate; the district court rejected that construction on the grounds that it would have “absurd consequences.”
The district court suggested that even SKB had expressed some discomfort with the implications of the “single crystal” construction of Claim 1. As a result, throughout the course of this litigation, both parties and two trial judges have considered multiple limitations that could be read into the claim — each of which proposed a minimum amount considerably larger than a single crystal. During the summary judg *1351 ment hearing, Judge Kocoras dismissed several attempts to introduce such limitations. Though he himself never adopted a construction, his ruling that SKB could admit evidence of infringement developed using all available testing techniques implies that SKB could pursue an infringement claim against anyone making, using, or selling detectable amounts of paroxetine hemihydrate. In his ruling following the bench trial, Judge Posner noted that under “ordinary” circumstances, claims with unambiguous plain language should be interpreted in a manner consistent with that plain language. There is little doubt that the “single crystal” interpretation is the only one consistent with the claim’s plain language.
Nevertheless, many of the “absurd consequences” that that the district court foresaw are, in fact, absurd, and would ill-serve the public were they the law. The proper place for resolutions of such conflicts between patent law and patent policy, however, is Congress, not the courts. For the most part, though, such absurdities are likely to lie not in the law itself, but rather in misapplications of the law. Here, the district court applied two additional elements of patent law to avoid the perceived absurdities. The district court found the single crystal theory indefinite, and applied various rules of claim construction to save the claim by limiting its scope. The district court introduced, a limitation explicitly excluding hemihydrate produced by involuntary conversion of a proportion of an anhydrous mixture sq small as to lack any commercial significance.
This conclusion, however, misinterprets the meaning of indefiniteness. The district court was certainly correct that indefinite claims could create socially undesirable “zone[s] of uncertainty which enterprise and experimentation may enter only at the. risk of infringement claims.” United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236, 63 S.Ct. 165, 87 L.Ed. 232 (1942). Such zones would undoubtedly “discourage invention only a little less than [would] unequivocal foreclosure of the field.” Id. The district court nevertheless erred in concluding that the mere possibility that a single crystal interpretation might discourage innovation and experimentation necessarily rendered the claim indefinite. The proper standard for assessing whether a patent claim satisfies the statutory requirement of definiteness is whether one skilled in the art would understand the bounds of the claim when read in light of the specification. Miles Labs., Inc. v. Shandon, Inc., 997 F.2d 870, 875 (Fed.Cir.1993); Exxon, 265 F.3d 1371, 1375 (Fed.Cir.2001).
As the Supreme Court has noted, all patents are capable of discouraging at least some innovation. Brenner v. Manson, 383 U.S. 519, 534, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966) (“[H]ow likely is disclosure of a patented process to spur research by others into the uses to which the product may be placed? To the extent that the patentee has power to enforce his patent, there is little incentive for others to undertake a search for uses.”). This discouragement, however, is simply part of the cost that the public bears to promote an overall patent system whose goal is to motivate more innovation than it deters. It is certainly possible that some individual patents will not have the desired effect, and will deter more innovation than they motivate. While such a result would hardly serve the public interest, this negative policy outcome is insufficient alone to render a patent claim indefinite. Indefinite *1352 ness must be examined within the framework provided by statute as clarified by our case law. We recently explained that “[a] claim is indefinite if, when read in light of the specification, it does not reasonably apprise those skilled in the art of the scope of the invention.” Amgen Inc. v. Hoechst Marion Roussel, 314 F.3d 1313, 1342 (Fed.Cir.2003). The contrapositive of this statement is also true. If the claim, read in light of the specification, reasonably apprises those skilled in the art of the scope of the invention, it is definite within the meaning of 35 U.S.C. § 112(2).
Given that standard, the district court’s error is evident. The plain language of Claim 1 is unambiguous. It claims “crystalline paroxetine hydrochloride hemihydrate,” unambiguously meaning all “crystalline paroxetine hydrochloride hemihydrate,” without any exceptions. Nothing in the claim language contradicts this straightforward interpretation — nor, for that matter, does anything in the patent’s written description, the patent’s figures, or the prosecution history. There is no reason for anyone, much less one skilled in the art, to read this plain language as meaning anything else, nor to believe that the patent meant to exclude small or trace amounts of crystalline paroxetine hydrochloride hemihydrate from its coverage. Those skilled in the art should certainly have appreciated the scope of the invention — even if they also viewed its breadth as damaging to their own efforts in experimentation and invention.
The district court read limitations from the written description into the claim language for reasons that appear to have stemmed from its public policy concerns. The court’s motivation notwithstanding, the practice of reading limitation from written descriptions into claims invariably leads to misconstrued claims. Simply pointing to discussions in the specification or prosecution history cannot rebut the presumption that claims should be afforded their ordinary meanings. CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed.Cir.2002). “We recognize that there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification.” Comark Communications v. Harris Corp., 156 F.3d 1182, 1187 (Fed.Cir.1998) (citations omitted). In this case, there is little doubt that the district court crossed that line.
The “single crystal” theory provides the only interpretation that is entirely consistent with the language of Claim 1 of the ’723 patent. This interpretation meets the statutory requirement for definiteness. It puts those skilled in the art on notice that the ’723 patent protects crystalline paroxetine hydrochloride hemihydrate, in all amounts, and that any manufacture, use, or sale of this compound — including inadvertent manufacture, use, or sale— would infringe the ’723 patent. The correct construction of Claim 1 adheres to the single crystal theory.
Because the ’723 patent claims every single crystal of paroxetine hemihydrate, and because Apotex’s paroxetine product contains at least some hemihydrate crystals, SKB has proven that Apotex’s product prima facie infringes — if Claim 1 is valid. Because Claim 1 is broad enough to encompass both patentable and unpatentable subject matter, however, I would find that it is invalid under 35 U.S.C. § 101.
I.

Authority

The question of patentability under section 101 does not arise often, and a court’s *1353 decision to raise it sua sponte is even less common. The centrality of patentable subject matter to the entire scope of the patent law suggests that there are times when such inquiries are critical. The Supreme Court established long ago that “the question whether the invention, which is the subject-matter in controversy, is patentable or not is always open to the consideration of the court, whether the point is raised by the answer or not.” Slawson v. Grand St. R.R., 107 U.S. 649, 652, 2 S.Ct. 663, 27 L.Ed. 576 (1882). See also Richards v. Chase Elevator Co., 158 U.S. 299, 301, 15 S.Ct. 831, 39 L.Ed. 991 (1895). These precedents remain good law, though the courts have relied upon them infrequently. The policy that drove them, however, remains vibrant. Less than a decade after Slawson, in the context of an interference, the Supreme Court stressed that
[t]he parties to the present suit appear to have been willing to ignore the question as to patentability in the present case, and to have litigated merely the question of priority of invention, on the assumption that the invention was patentable. But neither the Circuit Court nor this court can overlook the question of patentability.
Hill v. Wooster, 132 U.S. 693, 698, 10 S.Ct. 228, 33 L.Ed. 502 (1890). In our law, 37 C.F.R. § 41.77(b) specifically allows an administrative patent judge to raise the issue of patentability sua sponte as to claims designated to correspond to a count of an interference.
Beyond administrative proceedings, courts have found the occasional need to raise section 101 issues sua sponte — even subsequent to the 1952 revisions to the Patent Act. At least three of our sister circuits, whose rulings on patent law prior to 1982 do not bind this court but retain persuasive value, raised section 101 issues' that the parties had not addressed. The Ninth Circuit announced that “it is the duty of the court to dismiss a patent infringement suit whenever it affirmatively appears that the patent is invalid.” Barkeij v. Lockheed Aircraft Corp., 210 F.2d 1, 2 (9th Cir.1954). According to the Second Circuit, “[ejven were section 101 not raised by appellees, it was not error for the district court to consider it since it had the power to do so. Section 101 deals with the subject matter of patents and, as such, it is always open to the consideration of the court .... ” Howes v. Great Lakes Press Corp., 679 F.2d 1023, 1028 (2d Cir.1982). And the Third Circuit explained that
[i]t has been clear from an early date, that the court could dismiss a bill because the invention described in the patent was not patentable, even when no defense of invalidity was set up in the answer.... Accordingly, when a party brings suit on a patent alleging infringement, it is accountable for the validity of the patent....
Borden Co. v. Clearfield Cheese Co., 369 F.2d 96, 99-100 (3d Cir.1966).
The Federal Circuit has independently raised section 101 concerns without prompting from the parties at least once before. In Titanium Metals Corp. v. Banner, 778 F.2d 775 (Fed.Cir.1985), we considered a patent that the PTO had rejected as both anticipated under Section 102 and obvious under Section 103. Id. at 776. The district court reversed, and issued an order authorizing the Commissioner of Patents and Trademarks to issue the patent. Titanium Metals Corp. v. Mossinghoff, 603 F.Supp. 87, 91 (D.D.C.1984). The government appealed. The matter therefore reached this court on issues rele *1354 vant to sections 102 and 103, not to section 101. We explained, however, that
[t]he patent law imposes certain fundamental conditions for patentability, paramount among them being the condition that what is sought to be patented, as determined by the claims, be new. The basic provision of Title 35 applicable here is § 101 .... The title of the application here involved is “Titanium Alloy,” a composition of matter. Surprisingly, in all of the evidence, nobody discussed the key issue of whether the alloy was new, which is the essence of the anticipation issue....
Titanium Metals, 778 F.2d at 781. We concluded that “the decision and order of the district court holding that claims 1, 2, and 3 are directed to patentable subject matter and authorizing the issuance of a patent thereon were clearly erroneous and are reversed.” Id. at 783. In other words, we recognized that we could neither affirm nor reverse the district court’s holdings under Sections 102 and 103 in a principled way without addressing the underlying erroneous assumption that the invention at issue met the requirements of section 101. See also Brassica Prot. Prods. LLC v. Sunrise Farms (In re Cruciferous Sprout Litig.), 301 F.3d 1343, 1350 (Fed.Cir.2002) (characterizing as “common sense” Titanium Metals’ rationale, including the injection of section 101 into an anticipation analysis).
Both this court and the Supreme Court have recognized that there is a significant public policy interest in removing invalid patents from the public arena. In Cardinal Chem. Co. v. Morton Int’l, Inc., 508 U.S. 83, 100, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993), the Supreme Court reversed our practice of vacating findings of invalidity where the court found non-infringement in light of the strong public interest in resolving questions of patent validity. In Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Supreme Court commented at length on the wasteful consequences of relitigating the validity of a patent after it has once been held invalid. In United States v. Glaxo Group, Ltd., 410 U.S. 52, 57-58, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973), the Supreme Court ruled that the government, like patent licensees, could always challenge the validity of a patent in the course of prosecuting an antitrust action “to vindicate the public interest in enjoining violations of the Sherman Act.” The Court cited numerous cases[4] as “sufficient authority” to support this holding, id., which it saw as furthering a longstanding policy: “It is as important to the public that competition should not be repressed by worthless patents, as that the patentee of a really valuable invention should be protected in his monopoly....” Pope Mfg. Co. v. Gormully, 144 U.S. 224, 234, 12 S.Ct. 632, 36 L.Ed. 414 (1892).
These decisions mirror our own recognition that “[pjublic policy requires that only inventions which fully meet the statutory standards are entitled to patents.” Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1564 (Fed.Cir.1988) (cita *1355 tions omitted), and that “[t]here is a stronger public interest in the elimination of invalid patents than in the affirmation of a patent as valid.” Nestier Corp. v. Menasha Corp.-Lewisystems Div., 739 F.2d 1576, 1581 (Fed.Cir.1984). The best way to ensure that patents issue only for inventions in full compliance with the statutory standards is to allow “the validity of a patent, which was originally obtained in ex parte proceedings in the PTO, [to] be challenged in court.” Constant, 848 F.2d at 1564.
The sua sponte section 101 inquiry that this case warrants therefore falls well within a long if somewhat sparse tradition, driven in part by concerns of public policy but grounded entirely in legal authority. Where, as here, the facts are both unusual [5] and undisputed, where the legal implication of these facts is clear, and where a consideration of fundamental aspects of law and policy is necessary to maintain the integrity of the patent law, a sua sponte inquiry into the patentability of the claimed subject matter is appropriate.
II.

Theoi'y of Infringement

Because the proper construction of Claim 1 follows the “single crystal” theory, SKB must prove that Apotex’s product does and will continue to contain at least some hemihydrate. Though SKB’s legal burden is only to prove infringement by a preponderance of the evidence, S. Bravo Sys., Inc. v. Containment Techs. Corp., 96 F.3d 1372, 1376 (Fed.Cir.1996), SKB nevertheless faces a significant challenge. As the district court found, Apotex wants to manufacture pure anhydrate; any hemih-ydrate present in its product is an undesirable impurity. See SK II, 247 F.Supp.2d at 1015, 1025 & 1045. Both SKB and the district court explicitly rejected the possibility that the anhydrous and hemihydrous forms of paroxetine came into existence simultaneously, and that every batch of paroxetine ever manufactured (or that ever will be manufactured) contains at least trace elements of hemihydrate — an argument that would not only prove SKB’s point about Apotex’s product, but would also invalidate the ’723 patent as inherent in the prior art. Id. at 1025.
SKB’s basic theory of infringement, which the district court recognized as establishing a prima facie case of infringement when applied to the single crystal construction, id. at 1043, rests upon two scientific principles that remain matters of controversy within the scientific community, both as a general phenomena and as applied to paroxetine: seeding and conversion. See id. at 1021-23. Under this infringement theory, the form of paroxetine discovered in the 1970s was, indeed, pure anhydrate; hemihydrate did not exist until late 1984.
*1356 [SKB’s expert] Dr. Bernstein testified that he was ‘absolutely convinced’ that no hemihydrate had existed before December 1984... Dr. Terence Threlfall, Apotex’s expert on polymorphism, testified [that] Dr. Bernstein’s absolute certainty ... is not tenable. No one knows when the hemihydrate form of paroxe-tine came into existence, although it is a reasonable inference that it did not exist in a detectable amount until then.
Id. at 1022. From that date forward, however, it was impossible to produce pure anhydrate in a “seeded” environment because even under normal climactic conditions, at least some of the anhydrate would “convert” to become hemihydrate.
This process of ‘seeding’ the old with the new can be deliberate — that is, can be a method of manufacturing the new poly-morph — or adventitious, a result of the fact that some of the crystals become airborne and ‘contaminate’ the laboratory or plant in which the old crystal is being manufactured.... [T]he seeds relevant to this case are seeds that cause one polymorph to convert to another and these seeds are crystals of the form to which conversion occurs. A single tiny crystal, constituting a single seed, might induce conversion.... The creation of the new polymorph is likely to make the laboratory or plant where it is produced seeded, with the result that efforts to produce the old polymorph may instead produce the new one, since it is the more stable form. In principle it should be possible to re-create the old polymorph, just by replicating the exact procedure by which it used to be created, only this time in a seed-free environment.... [I]n practice efforts to re-create old poly-morphs do not always succeed, probably because the critical mass of molecules that is required to cause conversion is so minute....
Id. at 1020. SKB therefore argues that any paroxetine manufactured in a seeded environment must inevitably contain at least some hemihydrate, that this condition has only prevailed since some time in late 1984, and that Apotex’s facilities have been or inevitably will become seeded.
According to SmithKline, the BCI plant [in which Apotex manufactures anhyd-rate] is seeded with hemihydrate crystals because it was there that Apotex, exercising the broadened experimental-use privilege conferred by the Hatch-Waxman Act, used and made hemihyd-rate in the course of developing its anhydrous product.
Id. at 1024.
III.
SKB’s proof supporting this theory must rest upon factual demonstrations. As an appellate court, we accept all facts found by the district court unless they are clearly erroneous. Shockley v. Arcan, Inc., 248 F.3d 1349, 1357 (Fed.Cir.2001). The district court, however, stated its most significant finding as an hypothesis:
The conflicting testimony of Bernstein ... on the one hand and of Threlfall on the other can largely be reconciled on the following hypothesis: while the presence of hemihydrate seeds in a batch of anhydrate is likely, provided the ambient humidity and temperature are no lower than is normal in the temperate zone, to produce conversion within a short time, once the amount converted reaches a few percent of the mixture further conversion is unlikely without substantially greater humidity, temperature, or pressure.
*1357 SK II, 247 F.Supp.2d at 1022-23. Findings of fact stated as hypotheses pose particularly challenging problems for appellate courts. Did the district court accept this hypothesis as a fact upon which legal arguments and conclusions can rest, or was the district court merely trying to make sense of the scientific testimony that the two experts proffered?
The district court’s own legal conclusions make it clear that the court accepted them as facts, by stating, for example, that “[Apotex’s] BCI plant is seeded as a result of the mid-1990s experiments,” id. at 1032 (emphasis added), and that “the anhydrate as it proceeds through the process [at the BCI plant] will at several junctures be exposed to air that contains enough water molecules to permit conversion of anhyd-rate to hemihydrate.” Id. These statements make sense only if the district court found that both seeding and conversion are valid scientific facts, at least as applied to paroxetine for the purposes of this case.
The district court’s understandable hedging of its language when dealing with controversial scientific theories nevertheless led it to definitive factual conclusions: “BCI 'probably will be ‘making’ at least some hemihydrate crystals and therefore infringing, at least prima facie, patent 723 if claim 1 is interpreted to cover single crystals of the hemihydrate.” Id. (emphasis added). “Some conversion from anhyd-rate to hemihydrate is likely to occur in a seeded facility in which the anhydrate is exposed to air; BCI’s plant is seeded; and the anhydrate manufactured there is exposed to nondehumidified air before it leaves the plant.” Id. (emphasis added). But in concrete syllogistic conclusion, “[t]his evidence is sufficient to support an inference that BCI will be making at least tiny amounts of the hemihydrate if it is permitted to manufacture the anhydrate.” Id. (emphasis added).
The district court therefore found, as a matter of fact, that paroxetine anhydrate in a seeded environment characterized by normal climactic conditions can convert itself spontaneously into paroxetine hemih-ydrate. Id. The district court further found that SKB had met its burden of proving, by a preponderance of the evidence, that such conversion was inevitable at Apotex’s BCI manufacturing facility. Id. at 1042-43.
The district court next turned to consider Apotex’s defenses. “If ... claim 1 is valid and will be infringed ... by a single crystal of hemihydrate ... [then] Apotex has a complete affirmative defense that SmithKline is the cause of the infringement.” Id. at 1052. This conclusion makes sense only after a factual finding that Apo-tex’s legal experimentation with Paxil[6] seeded the BCI plant. Id. at 1024. “Apo-tex cannot eliminate all crystals of hemih-ydrate; under a single-crystal interpretation of claim 1, [and] SmithKline is the sole cause of infringement.” Id. at 1044 (emphasis in the original).
Finally, the district court explained that
it is difficult, and in some cases it may be impossible (paroxetine hydrochloride hemihydrate may be one of those cases- — no one knows), to destroy all the *1358 seeds in seeded premises.... Dr. Bernstein testified that if Apotex, desperate to avoid a charge of infringement built a new plant in Antarctica where no hemih-ydrate seeds had ever been and started manufacturing anhydrate there, and a depressed worker in the plant dropped a Paxil on the floor, the result might be to seed the plant and make it impossible from then on to produce pure anhydrate there.
Id. at 1020-21.
In short, the district court made four critical factual findings: (1) Hemihydrate crystals did not exist before their first emergence in an SKB laboratory in late 1984, id. at 1025; (2) Hemihydrate seeds spread easily, and increasingly large parts of the environment are becoming seeded, id. at 1020-21; (3) Under normal climactic conditions in a seeded environment, at least some anhydrate crystals will convert spontaneously to become hemihydrate crystals, id. at 1022-23; and (4) Apotex’s manufacturing facilities have been seeded, id. at 1024.
IV.
These findings of fact highlight the unique challenge that the infringement analysis of the ’723 patent poses: infringing matter has an unusual tendency to “appear” even where it is unwanted. Such a spontaneous appearance of a patented product vitiates the public notice function of patents. See id. at 1028. Under normal circumstances,
one of ordinary skill in the art should be able to read a patent, to discern which matter is disclosed and discussed in the written description, and to recognize which matter has been claimed. The ability to discern both what has been disclosed and what has been claimed is the essence of public notice. It tells the public which products or processes would infringe the patent and which would not.
PSC Computer Prods. v. Foxconn Int’l, 355 F.3d 1353, 1359 (Fed.Cir.2004). When the claimed product can be “made” via the spontaneous conversion of a noninfringing product into an infringing one, adequate notice is impossible — even if the claimed product was initially synthesized in a laboratory.
Long before 1952, when Section 112 formalized the modern written description requirement, the Supreme Court observed that:
Whoever discovers that a certain useful result will be produced, in any art, machine, manufacture, or composition of matter, by the use of certain means, is entitled to a patent for it; provided he specifies the means he uses in a manner so full and exact, that any one skilled in the science to which it appertains, can, by using the means he specifies, without any addition to, or subtraction from them, produce precisely the result he describes. And if this cannot be done by the means he describes, the patent is void. And if it can be done, then the patent confers on him the exclusive right to use the means he specifies to produce the result or effect he describes, and nothing more.
O’Reilly v. Morse, 15 How. 62, 119, 14 L.Ed. 601 (1853). The Supreme Court further explained that
[a]ecurate description of the invention is required by law, for several important purposes: 1. That the government may know what is granted, and what will become public property when the term *1359 of the monopoly expires. 2. That licensed persons desiring to practise the invention may know during the term how to make, construct, and use the invention. 3. That other inventors may know what part of the field of invention is unoccupied.
Bates v. Coe, 98 U.S. 31, 39, 25 L.Ed. 68 (1878). While these pre-1952 cases may not apply directly to the modern written description requirement of Section 112, they do demonstrate the longstanding centrality of the public notice function to patent policy.
Paroxetine hemihydrate forces us, for the first time, to confront the requirement that “a patentee specify in a manner so full and exact, that any one skilled in the science tó which it appertains, can, by [avoiding ] the means he specifies,” O’Reilly, 15 How. at 119, 14 L.Ed. 601, avoid producing the claimed product. Otherwise, there will be no way for “other inventors [to] know what part of the field of invention is unoccupied.” Bates, 98 U.S. at 39. Effective notice is impossible if a natural physical process can convert a noninfringing product into an infringing one.
The district court was correct in concluding that Claim 1 of the ’723 patent, subject to the proper single crystal construction, fails to provide suitable notice. SK II, 247 F.Supp.2d at 1028, 1052. A paroxetine anhydrate manufacturer, such as Apotex, could exert reasonable efforts to manufacture only products already in the public domain, could direct its entire production process toward developing only products that scrupulously respected all patent rights, and could nevertheless infringe because a natural physical process acting upon its legitimate anhydrous product “made” new hemihydrous crystals that Apotex then “sold” to the public. “Apotex has tried to prevent conversion of its product to the patented form and a principal issue in this case is whether it has succeeded; there is no suggestion that Apotex desires conversion.” SK II, 247 F.Supp.2d at 1015 (emphasis in original).
Claim 1 therefore cannot be valid. But the failure of notice is a consequence of its invalidity, not the source of it. We must consider- whether or not the ’723 patent covers only patentable subject matter. See Slawson, 107 U.S. at 652.
V.

Patentable Subject Matter

“Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent thereof ....” 35 U.S.C. § 101. The Supreme Court has' interpreted this statutory range of patentable subject matter to be quite broad, but hardly universal. “In choosing such expansive terms as ‘manufacture’ and ‘composition of matter,’ modified by the comprehensive ‘any,’ Congress plainly contemplated that the patent laws would be given wide scope.” Diamond v. Chakrabarty, 447 U.S. 303, 308, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). That wide scope nevertheless excludes laws of nature, natural phenomena, and abstract ideas. “Such discoveries are ‘manifestations of ... nature, free to all men and reserved exclusively to none.’ ” Id. at 309, 100 S.Ct. 2204, (quoting Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948)). See also Diamond v. Diehr, 450 U.S. 175, 185, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981); Parker v. Flook, 437 U.S. 584, 589, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978).
“Phenomena of nature, though just discovered, mental processes, and abstract *1360 intellectual concepts are not patentable, as they are the basic tools of scientific and technological work.” Gottschalk v. Benson, 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972). A single standard applies to product claims and process claims alike. Id. “[WJhether patents are allowable for [challenged subject matter] is not a matter of discretion, but of law.... Either the subject matter falls within Section 101 or it does not.” Animal Legal Def. Fund v. Quigg, 932 F.2d 920, 929-30 (Fed.Cir.1991). And as a matter of law, the critical distinction guiding all section 101 inquiries into the patentability of subject matter is that human-made, or synthetic, products or processes are patentable, while products and processes of nature are not. See Chakrabarty, 447 U.S. at 313, 100 S.Ct. 2204; J.E.M. AG Supply v. Pioneer Hi-Bred Int’l, 534 U.S. 124, 130, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001).
The district court found as a matter of fact that at some point, likely in late 1984, something occurred in SKB’s laboratories that gave rise to two new phenomena simultaneously. SK II, 247 F.Supp.2d at 1021-22. The first was a synthetic crystal later named paroxetine hemihydrate, id., ostensibly a patentable human-made invention under Chakrabarty. The second was a natural physical process whereby paroxetine anhydrate (a pre-existing synthetic crystal that today is in the public domain) could, under normal climactic conditions and with no human intervention, bond with water molecules and convert itself into paroxetine hemihydrate, SK II, 247 F.Supp.2d at 1021-22, ostensibly an unpatentable, newly discovered natural process under Chakrabarty.
This distinction between the synthetic product and its natural “reproduction” process is subtle, but critical. Paroxetine hemihydrate is not the first invention to blur the line between a natural process and a synthetic product, nor is it the first to engender confusion in the patent law. In the Nineteenth Century, the conflation of the natural acoustical principles of telephony with the invention of telephone equipment gave rise to massive litigation. See Telephone Cases, 126 U.S. 1, 8 S.Ct. 778, 31 L.Ed. 863 (1888). In disentangling this complex patent litigation, the Supreme Court noted that:
In one of the cases on appeal ... the court says: “There can be no patent for a mere principle. The discoverer of a natural force or a scientific fact cannot have a patent for that.” But it proceeds to make this exception nugatory by confounding the natural process (or scientific fact) with the invented process for working the apparatus; sustaining the patent for the last upon a construction which blindly sweeps in the first.
Id. at 270-71, 8 S.Ct. 778. The ’723 patent similarly confounds the scientific fact of paroxetine conversion with the invented product of paroxetine hemihydrate — and SKB similarly asks us to “sustain[J the patent for the last upon a construction which blindly sweeps in the first.” Id. We should not only decline to do so, as the majority has and as the district court did in the alternative, but we should be clear about both the character and the implications of the underlying request.
Paroxetine hemihydrate is presumably a synthetic compound, created by humans in a laboratory, never before existing in nature, that is nevertheless capable of “reproducing” itself through a natural process. SK II, 247 F.Supp.2d at 1022-23. This crystalline compound raises a question similar to one that might arise when considering the invention of a fertile plant *1361 or a genetically engineered organism, capable of reproduction, released into the wild. Consider, for example, what might happen if the wind blew fertile, genetically modified blue corn protected by a patent, from the field of a single farmer into neighboring cornfields. The harvest from those fields would soon contain at least some patented blue corn mixed in with the traditional public domain yellow corn— thereby infringing the patent. The wind would continue to blow, and the patented crops would spread throughout the continent, thereby turning most (if not all) North American corn farmers into unintentional, yet inevitable, infringers.[7] The implication — that the patent owner would be entitled to collect royalties from every farmer whose cornfields contained even a few patented blue stalks — cannot possibly be correct. The underlying question that engaged the district court, and that led it to develop numerous alternative holdings, is why this implication is incorrect.
At oral argument, when faced with this hypothetical, SKB expressed its belief that such a blue-corn patent would be “very strong.” Such a belief is misplaced. The implicit concept of “inevitable infringement” stems from the inevitable failure of the patent to provide public notice — which, in turn, stems from the inherently unpat-entable nature of the claimed subject matter.
This section 101 problem therefore brings us full circle, back to the impossibility of public notice. Under normal circumstances, inventors other than the patentee will understand how to avoid infringing a patent by avoiding the claimed product. Because products, such as our hypothetical blue corn or SKB’s paroxetine hemihyd-rate, that can be “made” through a natural process of spontaneous conversion imply inevitable infringement, no combination of claim language and written description could possibly teach even one skilled in the art how to avoid infringement. It is unsurprising that a requirement considered so trivial for most patentable products that we are content to let it remain implicit, namely a lesson in infringement avoidance, is effectively impossible for subject matter unpatentable under section 101. In short, patent claims drawn broadly enough to encompass products that spread, appear, and “reproduce” through natural processes cover subject matter unpatentable under section 101 — and are therefore invalid.
The majority asserts that a patentability analysis under section 101 does not consider whether a claimed product includes within its coverage naturally occurring compositions. The majority’s view is not, and has never been, the law. Patentability “requires an examination of the contested claims to see if the claimed subject matter as a whole” comes within the subject matter described in section 101. See AT&T Corp. v. Excel Communications, Inc., 172 F.3d 1352, 1357 (Fed.Cir.1999); accord In re Alappat, 33 F.3d 1526, 1557 (Fed.Cir.1994) (en banc). As this court has stated, “[t]he substantive issue at hand, whether the [patent] is invalid for failure to claim statutory subject matter under § 101, is a matter of both claim construction and statutory construction.” State Street Bank & Trust Co. v. Signature Fin. Group, Inc., 149 F.3d 1368, 1370 (Fed.Cir.1998). Both AT & T and State Street considered the *1362 scope of patent claims to determine their validity under section 101. The analysis provided by this concurrence is fully consistent with that approach.
Both Animal Legal Defense Fund, which the majority relies upon, and Chak-rabarty, which Animal Legal Defense Fund relies upon, considered the patenta-bility of “non-naturally occurring” organisms. Animal Legal Def. Fund, 932 F.2d at 927. The PTO rule at issue in Animal Legal Defense Fund announced that “non-naturally occurring non-human multicellu-lar living organisms” were patentable within section 101. Id. at 928. The same rule specifically announced that it “did not affect the principle .that products found in nature will not be considered” patentable. Id. When the court, as the majority quotes, asserted that “[ejither the subject matter falls within section 101'or it does not,” it adverted to that underlying taxonomy. Whether subject matter is patentable under section 101 cannot be decided without classifying it as “nonnaturally occurring” or “found in nature.”
Because the claimed PHC hemihydrate falls into both categories, it is not patentable under section 101. Merely limiting the claim to “synthetic PHC hemihydrate” would have solved the problem. But SmithKline Beecham did not.
VI.'
Technological advances have forced this court, our predecessor court, and the Supreme Court to consider the line between the natural and the non-natural' — including such inventions as non-naturally occurring plants and bacteria — several times over the past few decades. See, e.g., In re Bergy, 596 F.2d 952 (CCPA 1979), rev’d sub nom Diamond v. Chakrabarty, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980); Pioneer Hi-Bred Int’l, Inc. v. J.E.M. Agric. Supply, Inc., 200 F.3d 1374 (Fed.Cir.2000), aff'd 534 U.S. 124, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001). Parox-etine hemihydrate now appears to be the first patent litigated that forces the courts to consider the patentability of products and/or processes launched in a laboratory and released into nature.
Despite the complexity of the issue, the analysis is straightforward. An invention synthesized for the first time in a laboratory is eligible for patent protection under section 101. Processes for producing this synthetic product in the laboratory and/or for using this synthetic product may also be eligible for patent protection under section 101. However, a natural reproduction process, whether sexual, asexual, part of a chain reaction, or a process of decay, is ineligible for patent protection under section 101. Chakrabarty, 447 U.S. at 309, 100 S.Ct. 2204; Funk Bros., 333 U.S. at 130, 68 S.Ct. 440. An item reproduced by such a natural process, whether an inorganic structure or. a life form, must ipso facto be ineligible for patent protection under section 101.
The Supreme Court has cited with approval the Congressional Record surrounding the adoption of the Plánt Patent Act of 1930:
[A] plant discovery resulting from cultivation is unique, isolated, and is not repeated by nature, nor can it be reproduced by nature unaided by man .... ” S.Rep. No. 315, supra, at 6; H.R.Rep. No. 1129, supra, at 7. Congress thus recognized that the relevant distinction was not between living and inanimate things, but between products of nature, whether living or not, and human-made inventions.
*1363 Chakrabarty, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (emphasis added). In its recent ruling confirming that hybrid plants are patentable subject matter under section 101, the Supreme Court noted that “[hjybrid plants ... generally do not reproduce true-to-type, i.e., seeds produced by a hybrid plant do not reliably yield plants with the same hybrid characteristics. Thus, a farmer who wishes to continue growing hybrid plants generally needs to buy more hybrid seed.” J.E.M., 534 U.S. at 128, 122 S.Ct. 593.
The principle unifying these statements about patentability made in 1930,1980, and 2001, is that products capable of being “reproduced by nature unaided by man,” Chakrabarty, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144, are not patentable subject matter under section 101. Though the parties have not briefed this question directly, they and the district court have provided more than sufficient facts to obtain a dispositive and incontrovertible legal determination that Claim 1 of the ’723 patent is invalid under section 101.
The ’723 patent, correctly construed, claims every single crystal of paroxetine hemihydrate, including those crystals arising through natural conversion. The district court properly admitted SKB’s proffered expert testimony about the scientific mechanism underlying natural conversion, SK II, 247 F.Supp.2d at 1019-20, under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and General Electric v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), weighed it in conjunction with contradictory testimony proffered by Apo-tex’s experts, SK II, 247 F.Supp.2d at 1022, and concluded that at least some of Apotex’s anhydrate would convert itself to hemihydrate. SK II, 247 F.Supp.2d at 1022-23.
These findings lead to an inescapable conclusion — a conclusion that the majority attempts to dismiss as a question of “scope,” rather than of patentability. Had SKB claimed “synthetic or non-naturally occurring crystalline paroxetine hydrochloride hemihydrate,” the claim would have covered only patentable subject matter, and Apotex would be entitled to a judgment of noninfringement. Had SKB explicitly claimed the crystals converted in Apotex’s facilities, as either “the natural process of converting paroxetine an-hydrate to paroxetine hemihydrate” or “crystalline paroxetine hydrochloride hem-ihydrate arising through natural conversion,” unpatentability under section 101 would be manifest; though the claimed matter would be a useful composition, it would be one that occurred in nature. See Chakrabarty, 447 U.S. at 309, 100 S.Ct. 2204; Funk Bros., 333 U.S. at 130, 68 S.Ct. 440. By claiming simply “crystalline paroxetine hydrochloride hemihyd-rate” with no reference to how it was produced, SKB effectively claimed “crystalline paroxetine hydrochloride hemihyd-rate whether non-naturally occurring or arising through natural conversion.” Claim 1, as issued, therefore combines patentable and unpatentable subject matter, and is invalid under section 101. The “confusion” to which the majority alludes should never arise because we cannot reach Section 102 unless the claimed matter can overcome the hurdle of section 101.
Inventors wishing to claim products that can either be synthesized in laboratories or generated by natural processes may protect themselves by incorporating negative limitation terms like “non-natural” or “non-human” into the claims that they submit for examination. See Amgen Inc. v. Hoechst Marion Roussel, 314 F.3d 1313, 1329 (Fed.Cir.2003); Animal Legal Def. Fund, 932 F.2d at 923; In re Wakefield, *1364 422 F.2d at 904. SKB made no such distinction. SKB, despite an early recognition of seeding and conversion, SK II, 247 F.Supp.2d at 1022, claimed all paroxetine hemihydrate crystals, including both those “born” of natural conversion without human intervention and those “made” in a laboratory through explicit human effort. SKB further demonstrated its claim to a possessory right in naturally occurring crystals by pursuing this litigation, and articulated this claim explicitly during oral argument.
The asserted breadth of Claim 1 makes sense only under the erroneous belief that patents may protect products spread and reproduced by natural processes, directly contradicting our well established understanding of the limits imposed by section 101. Given current scientific trends, such a belief could easily lead to misdirected research investments, to inappropriately issued patents, and to a widespread in terrorem effect crippling entire industries whose artisans learn that even their best efforts to respect patent rights may not save them from liability as inadvertent, inevitable infringers. As the district court recognized, the notice function of patents is meaningless in such an environment, SK II, 247 F.Supp.2d at 1028. The lack of suitable notice could easily chill innovation, inquiry, experimentation, and commercial development. The patent law does not sanction the concept of inevitable infringement.
Because SKB’s assertion of the single crystal theory provides the correct construction of Claim 1, the ’723 patent claims paroxetine hemihydrate crystals reproduced by nature unaided by man — unpat-entable subject matter — and is therefore invalid under 35 U.S.C. § 101.

. "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.” 35 U.S.C. § 101.

. Dr. Joel Bernstein, one of SmithKline's expert witnesses at the trial, is an authority on "disappearing polymorphs.” See Joel Bernstein, Polymorphism in Molecular Crystals 89-92 (2002); J.D. Dunitz & J. Bernstein, "Disappearing Polymorphs,” 28 Accounts of Chem. Res. 193 (1995).

. Dr. Terence Threlfall.

. Telephone Cases, 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144 (1897); United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Sola Elec. Co. v. Jefferson Elec. Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942); Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374 (1947); MacGregor v. Westinghouse Elec. & Mfg. Co., 329 U.S. 402, 67 S.Ct 424, 91 L.Ed. 380 (1947); Pope Mfg. Co. v. Gormully, 144 U.S. 224, 234, 12 S.Ct 632, 36 L.Ed. 414 (1892); and Lear, Inc. v. Adkins, 395 U.S. 653, 670, 89 S.Ct 1902, 23 L.Ed.2d 610 (1969).

. The district court’s maze of alternative claim constructions and theories finding Apo-tex not liable for infringement, plus the theory added by the majority, attest to the unique circumstances of this case. The district court's opinion, and in particular its attempt to introduce a novel equitable defense, SmithKline Beecham Corp. v. Apotex Corp., 247 F.Supp.2d 1011, 1043-45 (N.D.Ill.2003) ("SK II"), strongly imply that something "feels wrong" about holding an infringer liable for inevitable, spontaneous infringement. We therefore face a choice. We can either address the issue head-on and explain why an attempt to patent unpatentable subject matter leads to so many apparent anomalies, or we can try to contort the aspects of patent law raised by the parties in order to avoid those anomalies. I believe that the law is best served by adopting the straightforward approach.

. Under the Hatch-Waxman Act, a generic drug manufacturer is allowed to experiment with a patented drug to prove that its planned product is bioequivalent to one already approved by the Food and Drug Administration (FDA). The district court viewed this statutory permission as an implied license, SK II, 247 F.Supp.2d at 1018, and attributed liability for the consequent seeding to SKB. Id. at 1044.

. Although intent is not a factor in determining infringement, public notice is required as a predicate to the validity of a patent. Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 n. 2 (Fed.Cir.1996). The hypothetical causes unavoidable infringement even in situations where the public would, in good faith, want to avoid infringing.